S K HANDTOOL CORPORATION *et al.*, Plaintiffs-Appellees, v. DRESSER INDUSTRIES, INC., Defendant-Appellant (Stephen C. Bruner, Appellant).

First District (1st Division)   No. 1—91—1403

Opinion filed April 19, 1993.—Rehearing denied June 23, 1993.—
Modified opinion filed June 28, 1993.

Kevin M. Forde and Winston & Strawn, both of Chicago (Stephen C. Bruner, Richard William Austin, and Catherine W. Joyce, of counsel), for appellants.

Law Offices of Frederic F. Brace, Jr., of Chicago (David L. Lee, of counsel), for appellees.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Dresser Industries, Inc. (Dresser), and contemnor Stephen C. Bruner appeal an order of the circuit court of Cook County finding Bruner in contempt of court for failing to comply with a prior order disqualifying Bruner's firm, Winston & Strawn, from representing defendant in a suit brought by plaintiffs SK Handtool Corporation (SK Handtool) and Corcoran Partners, Ltd. (Corcoran Partners). This underlying suit arises out of defendant Dresser's sale of its handtool division to Corcoran Partners.

The record on appeal indicates the following facts. Corcoran Partners has two general partners, Thomas Corcoran and Daniel Czuba. In 1982, Corcoran and Czuba chose Stephen P. Durchslag and his firm, Sidley & Austin, as general counsel for the partnership. At that time, Corcoran had known Durchslag for about nine years and considered Durchslag to be his personal attorney. Durchslag's practice is concentrated in the area of intellectual property.

While at Sidley & Austin, Durchslag advised Corcoran Partners regarding promotion, advertising and intellectual property matters. According to Corcoran and Czuba, Durchslag was their primary contact at Sidley & Austin; they would call him for advice and Durchslag would either handle the matter himself or find another attorney to handle the matter. According to the partners, Durchslag would also attend, stop by or discuss meetings they had with other attorneys at the firm. The partners also maintain that they both heard Durchslag state that Corcoran Partners was his largest account.

In the fall of 1983, Sidley & Austin represented Corcoran Partners in negotiations for the purchase of Dresser's handtool division. Sidley & Austin had previously represented Dresser in litigation, but Dresser gave specific and limited consent to Sidley & Austin's representation of Corcoran Partners in this transaction.

The transaction was consummated in October 1983. According to Durchslag, he was not actively involved in the transaction, but did have cursory general knowledge of it. According to Corcoran, Durchslag attended several meetings he had with Sidley & Austin regarding the purchase of the SK Handtool Corporation. Corcoran states that the value of the assets and liabilities of SK Handtool, the accuracy and completeness of SK Handtool's books, records and

ending date balance sheet, and proposed marketing strategies were discussed at these meetings.

Later, disputes arose between Corcoran Partners and Dresser concerning the transaction. Dresser refused to grant consent for Sidley & Austin to represent Corcoran Partners in these disputes. According to the partners, Durchslag recommended that they retain Frederic F. Brace, Jr., as litigation counsel. The partners maintain that Corcoran encouraged communications between Durchslag and Brace regarding the matter. According to Brace, Durchslag and other Sidley & Austin attorneys contacted him; they did not render advice, but discussed the matter and received progress reports.

The partners also state that Durchslag frequently discussed this litigation with them. They also state that they provided Durchslag with documents and court papers and received his opinion both on the legal strategy and the merits of the litigation. Corcoran further states that the partnership was billed for these discussions and that the bills were paid.

On August 1, 1989, Durchslag joined the firm of Winston & Strawn, which was representing Dresser in the litigation brought by Corcoran Partners. According to contemnor Bruner, Winston & Strawn had been representing Dresser since the inception of the litigation in May 1984. Suit had originally been filed in the circuit court of Cook County; Dresser had the case removed to Federal court. Following a court-supervised arbitration, the Federal case was dismissed on the eve of trial in July 1987. Plaintiffs refiled the suit in the circuit court of Kane County. Following a dismissal in that venue, plaintiffs refiled in the circuit court of Cook County. According to a legal assistant employed at Winston & Strawn, the firm has devoted over 10,000 hours to the litigation, including over 85 days spent deposing over 44 persons. More than 70,000 pages of documents have been produced in the litigation.

A letter from Brace to Bruner dated August 7, 1989, and marked "VIA HAND DELIVERY" appears in the record. The letter notes Durchslag's relationship with Corcoran Partners and requests that Winston & Strawn immediately withdraw as counsel for Dresser. The letter concludes by indicating that if Brace did not hear from Bruner by the close of business the following day, Brace would assume that Bruner intended to continue to represent Dresser and would proceed accordingly.

A letter from Bruner to Brace dated August 8, 1989, and marked "BY MESSENGER" appears in the record. In the letter, Bruner indicates that he did not know of a relationship between

Corcoran Partners and Durchslag. Bruner also indicates that he had not spoken to Durchslag about the substance of litigation and did not intend to do so in the future. The letter does not indicate that Bruner or his firm planned to withdraw from representing Dresser.

According to Durchslag, he and Bruner discussed Brace's letter on August 8, 1989. Durchslag also approved a copy of Bruner's proposed reply. Durchslag states that he and Bruner did not discuss the substance of the litigation and would not do so in the future.

The record indicates that in addition to contemnor, Winston & Strawn attorneys directly representing Dresser in the litigation were Jane McCullough and Kimball Anderson. An affidavit by Ms. McCullough states that she also received a copy of Brace's letter and has not discussed the case with Durchslag. An affidavit by Mr. Anderson states that he has not discussed the case with Durchslag, but does not indicate whether he received a copy of Brace's letter.

According to Corcoran and Czuba, Durchslag attempted to solicit the legal business of Corcoran Partners for Winston & Strawn during August 1989. In particular, the partners maintain that on August 29, 1989, while at a golf outing, Durchslag and several other Winston & Strawn attorneys attempted to solicit Corcoran Partners' business with respect to a transaction that Sidley & Austin could not handle due to a conflict of interest. The partners stated that they wished to consult with Brace before retaining Winston & Strawn due to the firm's representation of Dresser. Brace advised the partners against retaining Winston & Strawn.

On September 7, 1989, Corcoran Partners filed a motion to disqualify Winston & Strawn from further representing Dresser in the litigation. The motion claims that Winston & Strawn's continued representation would constitute a conflict of interest in violation of Canons 4, 5, and 9 of the Illinois Code of Professional Responsibility (107 Ill. 2d Canons 4, 5, 9).

The record contains a memorandum dated September 7, 1989, that appears to be directed to all personnel of Winston & Strawn. The memorandum is from Gary Fairchild, who was the managing partner at Winston & Strawn, according to Bruner. The memorandum notes that Durchslag and two other Sidley & Austin attorneys had recently joined Winston & Strawn. The memorandum also notes Durchslag's prior representation of Corcoran Partners and Winston & Strawn's representation of Dresser in the litigation brought by Corcoran Partners. The memorandum indicates that it had been determined that the firm's professional judgment on behalf of Dresser would not be impaired by the involvement of the

three newly associated attorneys from Sidley & Austin and had notified Dresser to this effect.

The memorandum then sets forth rules regarding the litigation, to wit: (1) none of the newly associated attorneys could discuss the litigation with any Winston & Strawn personnel other than one of the other newly associated attorneys: (2) no Winston & Strawn personnel could discuss the litigation with any of the newly associated attorneys; (3) all files relating to Dresser's defense of the litigation would be secured by those having custody or control of them and could not be examined by or made available to any of the newly associated attorneys; and (4) all Winston & Strawn attorneys, including the newly associated attorneys, would not represent any of the adverse parties in the litigation.

On January 18, 1990, the trial court held a hearing on the disqualification motion. On March 13, 1990, the trial court entered an order and issued a written opinion granting the motion and disqualifying Bruner and Winston & Strawn from further representation of Dresser in the litigation. The trial court subsequently denied Dresser's motion to reconsider. However, on May 1, 1990, the trial court certified the matter for an immediate appeal to this court, pursuant to Illinois Supreme Court Rule 308 (134 Ill. 2d R. 308). This court denied Dresser's May 15, 1990, application for leave to appeal on September 8, 1990. Dresser then filed a petition for leave to appeal to the Illinois Supreme Court on October 22, 1990, which was denied on February 6, 1991.

On April 16, 1991, Bruner returned to the trial court. Counsel for both sides of the litigation indicated that the only avenue remaining to seek review of the disqualification order was to find Bruner in contempt of that order. The trial court entered an order finding Bruner in contempt of court and imposing a $100 fine, though enforcement was stayed pursuant to Illinois Supreme Court Rule 305(b) (107 Ill. 2d R. 305(b)). In the transcript of proceedings dated April 16, 1991, the trial court indicates that Bruner was acting at Dresser's request and the contempt finding should not reflect on Bruner's qualifications for judicial or political office. Defendant Dresser and contemnor Bruner filed a timely notice of appeal to this court.

## I

■ Initially, although plaintiffs do not raise the issue, we have a duty to consider our jurisdiction and to dismiss an appeal if jurisdiction is wanting. (*Ferguson v. Riverside Medical Center* (1985),

111 Ill. 2d 436, 440, 490 N.E.2d 1252, 1253; *Voiland v. Warsawsky* (1989), 182 Ill. App. 3d 332, 334, 538 N.E.2d 764, 765.) Defendant and contemnor appeal a finding of civil contempt, including a $100 fine, imposed for contemnor's failure to obey the trial court's prior disqualification order. This court has jurisdiction of the contempt finding, which also brings the propriety of the underlying disqualification order before this court. *Index Futures Group, Inc. v. Street* (1987), 163 Ill. App. 3d 654, 657, 516 N.E.2d 890, 892-93.

II

In reviewing the disqualification order, this court will not disturb any of the trial court's factual determinations absent an abuse of discretion. However, this court will engage in an independent review of questions of law presented by the order. *Skokie Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.* (1983), 116 Ill. App. 3d 1043, 1054, 452 N.E.2d 804, 812; see also *Freeman v. Chicago Musical Instrument Co.* (7th Cir. 1982), 689 F.2d 715, 721 (trial courts enjoy no advantage over appellate courts in formulation of ethical norms).

There remains the question of which law is applicable. The parties have referred not only to Illinois cases, but also to Federal cases in support of their respective positions. Federal decisions as to the law of Illinois (other than United States Supreme Court decisions) are not binding on this court. Nevertheless, the parties' reliance on them seems appropriate, given that the Federal courts interpret rules of legal ethics drafted by the American Bar Association and this State's rules of legal ethics are largely similar to those drafted by the ABA. (*Herbes v. Graham* (1989), 180 Ill. App. 3d 692, 699, 536 N.E.2d 164, 167-68.) Furthermore, it appears that the Seventh Circuit has most thoroughly considered the type of issues raised in this appeal. (*Smith v. Whatcott* (10th Cir. 1985), 757 F.2d 1098, 1101.) Given that the Seventh Circuit is also the Federal appellate court most likely to confront such issues in cases involving Illinois law or litigants, we will pay special attention to Seventh Circuit case law on the issues raised here.

There is also the question of which form of the rules of legal ethics are applicable. At the time of the events described above, the Illinois Code of Professional Responsibility (Illinois Code), modeled on the ABA Code of Professional Responsibility (ABA Code), was in effect. The following provisions of the Illinois Code seem to be at issue in this appeal:

"Rule 4—101. Preservation of Confidences and Secrets of a Client
***

(b) Except when permitted under Rules 4—101(c) and (d), a lawyer shall not knowingly, during or after termination of the professional relationship to his client,

(1) reveal a confidence or secret of his client;

(2) use a confidence or secret of his client to the disadvantage of the client; or

(3) use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.
* * *

(e) A lawyer shall exercise reasonable care to prevent his employees, associates, and others whose services are utilized by him from disclosing or using confidences or secrets of a client, except that a lawyer may permit an employee to reveal the information allowed by Rules 4—101(c) and 4—101(d)."

"Rule 5—105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer
***

(b) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under Rule 5—105(c).
***

(d) If a lawyer is required to decline employment or to withdraw from employment under Rule 5—105, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." (107 Ill. 2d Rules 4—101(b), (e), 5—105(b), (d).)

Both Illinois and Federal courts have looked to the protections of their respective Codes, including Canon 9 (which states in both Codes that an attorney should avoid the appearance of impropriety) in reviewing motions to disqualify attorneys and law firms. *E.g., La Salle National Bank v. Triumvera Homeowners Association* (1982), 109 Ill. App. 3d 654, 664, 440 N.E.2d 1073, 1080 (hereinafter *Triumvera*) (looking to Canons 4 and 9 of the Illinois Code);

*La Salle National Bank v. County of Lake* (7th Cir. 1983), 703 F.2d 252, 255 (hereinafter *La Salle*) (looking to Canons 4 and 9 of the ABA Code); *Papanicolaou v. Chase Manhattan Bank, N.A.* (S.D.N.Y. 1989), 720 F. Supp. 1080, 1083 (looking to Canons 4 and 5 of the ABA Code).

On August 1, 1990, however, before the contempt order in this case was entered, the Illinois Code was repealed and superseded by the Illinois Rules of Professional Conduct (Illinois Rules), modeled on the more recent ABA Rules of Professional Conduct. The parties both discuss Illinois Rule 1.10, which provides, in relevant part, as follows:

> "Rule 1.10. Imputed Disqualification: General Rule
>
> (a) No lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with that firm would be prohibited from doing so by Rules 1.7, 1.8(c) or 1.9, except as permitted by Rules 1.10(b), (c), or (d), or by Rule 1.11 or Rule 1.12.
>
> (b) When a lawyer becomes associated with a firm, the firm may not represent a person in a matter that the firm knows or reasonably should know is the same or substantially related to a matter in which the newly associated lawyer, or a firm with which that lawyer was associated, had previously represented a client whose interests are materially adverse to that person unless:
>
> > (1) the newly associated lawyer has no information protected by Rule 1.6 or Rule 1.9 that is material to the matter; or
> >
> > (2) the newly associated lawyer is screened from any participation in the matter.
>
> (c) When a lawyer has terminated an association with a firm, the firm may thereafter represent a person with interests materially adverse to those of a client represented by the formerly associated lawyer if:
>
> > (1) the matter is not the same or substantially related to that in which the formerly associated lawyer represented the client; and
> >
> > (2) no lawyer remaining in the firm has information protected by Rule 1.6 and Rule 1.10 that is material to the matter." (134 Ill. 2d R. 1.10.)

It is not surprising that the parties focus on Illinois Rule 1.10, given that it explicitly addresses the type of situation involved on appeal, whereas the Illinois Code and the ABA Code did not. More-

over, the Kutak Commission that drafted the proposed ABA Rules and the ABA House of Delegates both rejected the concept of screening for nongovernment attorneys. (See G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct 192.2 (Supp. 1989); Rotunda, *The New Illinois Rules of Professional Conduct: A Brief Introduction & Comment*, 78 Ill. B.J. 386, 390 (1990); ABA Commission on Evaluation of Professional Standards, *Model Rules of Professional Conduct*, Rule 1.10 (1984).) Illinois Rule 1.10 is thus unusual in this regard.

■ Both the change from ABA Code to the ABA Rules and the Federal decisions on disqualification reflect a trend toward a more functional analysis of conflict of interest questions. (See *Smith v. Whatcott* (10th Cir. 1985), 757 F.2d 1098, 1101 & n.2 (and citations therein).) While the Illinois Code was in effect, this court considered the ABA Rules when reviewing the denial of a disqualification motion. (See *In re Marriage of Thornton* (1985), 138 Ill. App. 3d 906, 916-17, 486 N.E.2d 1288, 1295.) Illinois Rule 1.10(b) suggests that screening is to be viewed even more favorably than would be the case under the ABA Rules. While the events at issue in this case occurred before the effective date of the Illinois Rules, we will consider them as secondary authority in this case.

### III
■ The main question on appeal is whether the trial court erred in disqualifying contemnor and the firm of Winston & Strawn from representing Dresser in this litigation. Generally, our courts disapprove of the use of disqualification motions as a tactical weapon in litigation insofar as such motions can be misused for purposes of harassment. Such motions serve to destroy the attorney-client relationship by preventing a party from freely retaining the counsel of his or her choice. (See *Hannan v. Watt* (1986), 147 Ill. App. 3d 456, 497 N.E.2d 1307.) Thus, disqualification is regarded as a drastic measure which courts should grant only when necessary. (See *Freeman*, 689 F.2d at 721.) On the other hand, the rules of legal ethics are aimed at protecting the attorney-client relationship, maintaining public confidence in the legal profession and ensuring the integrity of judicial proceedings. (See *Skokie Gold*, 116 Ill. App. 3d at 1057, 452 N.E.2d at 814; *Freeman*, 689 F.2d at 721.) Violations of the prohibitions of Canons 4 and 5 give rise to high probability that a trial may be tainted. (*Papanicolaou*, 720 F. Supp. at 1083-84.) Accordingly, any doubts as to the existence of a conflict

should be resolved in favor of disqualification. *Skokie Gold,* 116 Ill. App. 3d at 1057, 452 N.E.2d at 814.

■ The disqualification order in this case is based on the fact that Durchslag, who had previously represented Corcoran Partners at Sidley & Austin, had joined Winston & Strawn. Generally, a court analyzing this question must determine whether there is a "substantial relationship" between the subject matter of the prior and current representations. If such a relationship exists, it is presumed that the client disclosed confidential information to the attorney during the prior representation. (*Skokie Gold,* 116 Ill. App. 3d at 1055, 452 N.E.2d at 813; *Novo Therapeutisk Laboratorium v. Baxter Travenol Laboratories, Inc.* (7th Cir. 1979), 607 F.2d 186, 196 (en banc).) This presumption is irrebuttable under both Illinois and Federal case law. See *Skokie Gold,* 116 Ill. App. 3d at 1055-56, 452 N.E.2d at 813 (and citations of Federal law therein).

On appeal, Dresser does not contest that there was a substantial relationship between the subject matter of Durchslag's representation of Corcoran Partners at Sidley & Austin and Winston & Strawn's representation of Dresser in this litigation. Nor did Dresser contest the presumption that Durchslag received confidences and secrets from Corcoran Partners during the prior representation. Nor does Dresser contest on appeal whether Durchslag should be disqualified in this case.

Instead, Dresser and contemnor focus on the presumption that Durchslag may intentionally or inadvertently share confidences gained while representing Corcoran Partners at Sidley & Austin with contemnor or Winston & Strawn personnel (aside from the other former Sidley & Austin attorneys). This presumption exists under both Illinois and Federal case law. (See *Weglarz v. Bruck* (1984), 128 Ill. App. 3d 1, 6-7, 470 N.E.2d 21, 26; *La Salle,* 703 F.2d at 257.) Dresser and contemnor raise three major arguments regarding this presumption. We address each of these arguments in turn.

A

Dresser and contemnor contend that the presumption of shared confidences at the new firm may be rebutted by effective screening of the newly associated attorney.

The State of Illinois law on the use of screening is sparse. In *Weglarz v. Bruck* (1984), 128 Ill. App. 3d 1, 4-5, 470 N.E.2d 21, 25, a divided court indicated that a "Chinese wall" can be used to rebut the presumption of shared confidences only where the attorney

can clearly and effectively show that he had no knowledge of the client's secrets and confidences. A year later, however, this court indicated that screening could dissipate any appearance of impropriety caused where a judge who had ruled against a wife's discovery requests in a divorce action joined her husband's law firm. (*Thornton*, 138 Ill. App. 3d at 915-17, 486 N.E.2d at 1294-97.) *Thornton* is distinguishable from *Weglarz*, insofar as the personal disqualification of a former judge did not automatically disqualify his or her new firm under the Illinois Code. (*Thornton*, 138 Ill. App. 3d at 917, 486 N.E.2d at 1296.) Moreover, the confidentiality at the heart of the attorney-client relationship generally does not exist between a judge and the litigants before that judge. On the other hand, the need to discourage judges from handling matters in a way that would encourage their future employment and the need to maintain public confidence in the impartiality of our judiciary are also legitimate and important. (*Thornton*, 138 Ill. App. 3d at 917, 486 N.E.2d at 1295.) We therefore view *Thornton*, along with the adoption of the Illinois Rules, as marking a greater inclination to accept screening as an effective remedy for potential ethical problems in legal representation.

■ In sum, it appears that the trend of Illinois and Federal case law, as well as the adoption of the Illinois Rules, is toward allowing the existence of effective screening to rebut the presumption of shared confidences between a newly associated attorney and his new firm. Accordingly, we hold that the presumption of shared confidences at the new firm may be rebutted by effective screening of a newly associated attorney. See *La Salle*, 703 F.2d at 257-59; *Schiessle v. Stephens* (7th Cir. 1983), 717 F.2d 417, 421; 134 Ill. 2d R. 1.10(b)(2).

B

Dresser and contemnor next contend that the screening in this case was effective, despite the fact that it was not imposed until five weeks after Durchslag joined the firm.

In *Thornton*, a former judge's new firm circulated a memorandum among its employees prior to the former judge's arrival directing that the former judge was not to be consulted on the case and prohibiting the former judge from access to the case files. (See *Thornton*, 138 Ill. App. 3d at 916, 486 N.E.2d at 1295.) The *Thornton* court commented favorably on this arrangement, but did not indicate whether the timing was a determinative issue. *Thornton*, 138 Ill. App. 3d at 917, 486 N.E.2d at 1296.

■ The Seventh Circuit has generally held that "specific institutional mechanisms" must be in place when a conflict occurs to prevent the sharing of information. For example, in *La Salle*, the court affirmed a disqualification order where the new firm had not instituted screening until a disqualification motion had been filed, which was six months after the newly associated attorney had joined the firm. The court noted that its analysis

> "frequently requires identification of problems at the time attorneys are hired. In some cases, this may be difficult or even impossible. Nevertheless, [it] believe[d] that *timely* screening arrangements are essential to the avoidance of firm disqualification." (Emphasis in original.) (*La Salle*, 703 F.2d at 259 n.3.)

Likewise, in *Schiessle*, the court affirmed a disqualification order where:

> "The record *** show[ed] that the [new] firm at the time of [the attorney's] transfer did not have specific institutional mechanisms under *La Salle* to insure that [the newly associated attorney] would have no contact with the Schiessle case." (*Schiessle*, 717 F.2d at 421.)

The Illinois Rule 1.10 provides, in relevant part:

> "(e) For the purposes of Rule 1.10, *** a lawyer in a firm will be deemed to have been screened from any participation in a matter if:
>
> (1) the lawyer has been isolated from confidences, secrets and material knowledge concerning the matter;
>
> (2) the lawyer has been isolated from all contact with the client or any agent, officer, or employee of the client and any witness for or against the client;
>
> (3) the lawyer and the firm have been precluded from discussing the matter with each other; and
>
> (4) the firm has taken affirmative steps to accomplish the foregoing." 134 Ill. 2d R. 1.10(e).

In this case, the record indicates that a screening memorandum was not circulated within Winston & Strawn until September 7, 1989—five weeks after Durchslag joined the firm. .

If this court were to follow the *La Salle—Schiessle* line of cases, as the trial court did, the disqualification would unquestionably be proper in this case. Defendant and contemnor, however, raise several objections to relying on the *La Salle—Schiessle* line of cases. We address each in turn.

First, defendant and contemnor rely on a line of cases beginning with *Panduit Corp. v. All States Plastic Manufacturing Co.* (Fed. Cir. 1984), 744 F.2d 1564, 1578-81, in which the Federal Circuit, interpreting Seventh Circuit decisions including *La Salle* and *Schiessle,* indicated that proof of formal screening is not the only method of rebutting the presumption of shared confidences in the new firm. *Panduit,* 744 F.2d at 1580.

Defendant and contemnor's reliance on *Panduit* is misplaced. *Panduit* held that the new firm should not be disqualified because the newly associated attorney had only *imputed* knowledge of the complaining client's confidences. The Federal Circuit was unwilling to "reimpute" imputed knowledge to the new firm. (*Panduit,* 744 F.2d at 1578-79.) The Federal Circuit distinguished the case before it from *Schiessle,* where the attorney had direct knowledge of the client's confidences. (*Panduit,* 744 F.2d at 1580.) In this appeal, defendant and contemnor do not contest that Durchslag had direct knowledge of Corcoran Partners' confidences or that Durchslag should be personally disqualified.

In addition, the *Panduit* court's interpretation of *La Salle* and *Schiessle* in *dicta* is flawed. The *Panduit* court indicated that interpreting *La Salle* and *Schiessle* as holding that screening is the only method of rebutting the presumption of shared confidences at the new firm would conflict with the Seventh Circuit's earlier decision in *Novo Therapeutisk Laboratorium v. Baxter Travenol Laboratories, Inc.* (7th Cir. 1979), 607 F.2d 186 (en banc). In *Novo,* a presumption of shared confidences within a firm was clearly and effectively rebutted by affidavits of firm members stating that they received no protected confidences from the attorney. *Novo,* 607 F.2d at 197 (en banc).

However, the issue in *Novo* was the disqualification of the newly associated attorney's *former* firm. (*Novo,* 607 F.2d at 194 (en banc); see *Panduit,* 744 F.2d at 1579-80.) The issue in *La Salle* and *Schiessle* was the disqualification of the attorney's *new* firm. (See *La Salle,* 703 F.2d at 257; *Schiessle,* 717 F.2d at 421.) The two situations are not identical and are not treated identically under the Illinois Rules. (Compare 134 Ill. 2d R. 1.10(b) with 134 Ill. 2d R. 1.10(c).) Moreover, in *Novo,* the newly associated attorney retained his client and was not in an adversary relationship with the client. (*Novo,* 607 F.2d at 197 (en banc).) Indeed, in *Novo,* the disqualification motion was made by the newly associated attorney, who failed to allege, even in general terms, what confidences the members of his former firm may have received. (*Novo,* 607 F.2d at 197 (en

banc).) In contrast, the newly associated attorneys in both *La Salle* and *Schiessle* had a substantial relationship to the litigation and had not retained their original clients. (See *La Salle*, 703 F.2d at 257; *Schiessle*, 717 F.2d at 420.) Certainly, such factors may aid a trial court in determining whether there is a legitimate concern that confidences may be shared or whether the disqualification motion is intended only to harass.[1]

Next, defendant and contemnor rely on cases indicating that the screening may be considered timely, even if it is not in place when the attorney joins the firm. (*E.g., E Z Paintr Corp. v. Padco, Inc.* (Fed. Cir. 1984), 746 F.2d 1459.) In *E Z Paintr*, the Federal Circuit indicated that the trial court could disqualify an entire firm where the screen had not been erected " 'when the potentially disqualifying event occurred' and the new firm knows (or must have been aware) of the problem." (*E Z Paintr*, 746 F.2d at 1462, quoting *La Salle*, 703 F. 2d at 259.) This would seem to accord with Illinois Rule 1.10(b), which refers to whether the new firm "knows or reasonably should know" of the problem. 134 Ill. 2d R. 1.10(b).

The question arises as to when Winston & Strawn knew or reasonably should have known of the problem. Defendant and contemnor argue that Winston & Strawn could not have known of the conflict when Durchslag joined the firm. They rely on the Bruner affidavit, which states that in the Federal portion of this litigation, Sidley & Austin was required to produce documents reflecting communications between plaintiffs and Sidley & Austin personnel regarding the sale and the Federal suit. The affidavit further indicates that none of the documents produced indicated that Sidley & Austin had given plaintiffs any legal advice regarding the Federal suit.

---

[1]This court's decision in *Index Futures Group, Inc. v. Street* (1987), 163 Ill. App. 3d 654, 516 N.E.2d 890, may also be illustrative of the differences between *Panduit* and *Novo*. In *Index Futures Group*, the plaintiff sought to disqualify defense counsel after attorneys from plaintiff's firm joined the defense firm. This court reversed the disqualification order entered by the trial court. As in *Panduit*, plaintiff sought disqualification of the new firm, but this court refused to reimpute imputed knowledge to the new firm. This court, like the *Panduit* court, also relied on *Novo* in reaching its conclusion. Unlike *Panduit*, reliance on *Novo* in *Index Futures Group* was proper because plaintiff's attorneys admitted that the attorneys who joined the defense firm shared none of plaintiff's confidences. Accordingly, the motion could have been viewed as tactical. In contrast, the record here is undisputed that Durchslag shared Corcoran Partners' confidences.

The affidavit does not state that none of the documents produced indicate that Sidley & Austin personnel did not advise plaintiffs regarding the sale itself. According to the Corcoran and Czuba affidavits, Durchslag attended meetings regarding the sale. Durchslag claims in his affidavit that he was not actively involved in the sale, but did have general knowledge regarding it. Bruner's affidavit does not eliminate the possibility that the documents produced by Sidley & Austin may indicate that Durchslag was involved in the sale negotiations.

Moreover, the firm arguably should have known of the problem when it hired Durchslag regardless of what the documents produced by Sidley & Austin may show. *La Salle* and *Schiessle* require the new firm to make some effort to ascertain in advance whether the hiring of a new attorney will require screening. (*La Salle*, 703 F.2d at 259 & n.3; *Schiessle*, 717 F.2d at 421.) In addition, while Illinois Rule 1.10(b) refers to the knowledge of the firm, it does so in the context of "When a lawyer becomes associated with a firm ***." (134 Ill. 2d R. 1.10(b).) Illinois Rule 1.10 also indicates that a firm must take "affirmative steps" to accomplish screening before such screening will be deemed adequate. See 134 Ill. 2d R. 1.10(e)(4).

Defendant and contemnor asserted at oral argument that Winston & Strawn attempted to determine whether hiring Durchslag could cause a conflict. The record is silent as to whether any such effort was made. Corcoran and Czuba maintain, and defendant and contemnor did not dispute, that Corcoran Partners was one of Durchslag's biggest clients. The record further indicates that plaintiffs' attorney notified contemnor of the problem almost immediately after hearing that Durchslag had joined Winston & Strawn. A trial court could infer that if plaintiffs' attorney could see the problem, Durchslag could have seen it and mentioned it upon agreeing to join the new firm.

However, this court does not need to determine whether any factual determination in this regard would be an abuse of discretion. Nor does this court need to decide today whether screening must be in place on the day an attorney joins a firm to prevent disqualification as a matter of law. The record indicates that contemnor and other Winston & Strawn personnel had *actual* knowledge of the problem on August 7 and 8, 1989, when contemnor was informed by Brace of the problem. In their brief, defendant and contemnor contend:

"[T]he undisputed evidence is that on August 8, 1989, *** the next day after Mr. Bruner was advised of Corcoran's

> claim of a conflict, preliminary screening procedures were put into effect, and Corcoran's attorney was assured in writing that no communications between Mr. Durchslag and the attorneys representing Dresser had taken place or would take place related to the Dresser litigation."

The page of the record to which defendant and contemnor cite in support of this contention is the August 8, 1989, letter from Bruner to Brace. Although this letter states that Bruner had not spoken to Durchslag about the substance of the litigation and would not in the future, there is absolutely nothing else in the letter from which it could be inferred that any screening procedures were put in place at that time. Nor did the letter refer to other attorneys working on the Dresser litigation.

Later in their brief, defendant and contemnor state:

> "As soon as Mr. Bruner was informed of the potential conflict, preliminary screening prohibitions which essentially barred all prohibited communications immediately were put in place and this fact was communicated to Corcoran." ·

Defendant and contemnor cite the Bruner affidavit to support this contention. However, the Bruner affidavit merely recounts the sequence of events surrounding the exchange of letters between Brace and Bruner and the circulation of the screening memorandum five weeks later. The Bruner affidavit does not establish that contemnor or Winston & Strawn personnel took any action other than that contemnor and Durchslag agreed not to discuss the substance of the litigation. Indeed, the Bruner affidavit indicates that the relevant files were not placed in a locked room with limited distribution of keys until after the screening memorandum was issued.

In addition, the record in this case indicates that between August 8, 1989, and September 7, 1989, Durchslag and other Winston & Strawn attorneys attempted to solicit Corcoran Partners' business regarding a transaction that could not be handled by Sidley & Austin. The record further indicates that the screening memorandum was not circulated at Winston & Strawn until the day the disqualification motion was filed.

The screening memorandum that was eventually circulated provided that none of the newly associated attorneys could discuss the litigation with any Winston & Strawn personnel other than one of the other newly associated attorneys. As of August 8, 1989, Durchslag may have known not to speak to anyone about the litigation. The screening memorandum provided that no Winston & Strawn personnel could discuss the litigation with any of the newly associ-

ated attorneys. As of August 8, 1989, Bruner and Ms. McCullough may have known not to speak to the former Sidley & Austin attorneys, but the record provides no indication that any other Winston & Strawn personnel were so barred. In particular, the Anderson affidavit does not indicate whether Anderson knew of Brace's letter on August 8, 1989. The screening memorandum provided that all files relating to Dresser's defense of the litigation would be secured by those having custody or control of them and could not be examined by or made available to any of the newly associated attorneys. The record indicates that this was not done before the memorandum was circulated. The screening memorandum provided that no Winston & Strawn attorneys, including the newly associated attorneys, would represent any of the adverse parties on any matter. The record indicates that Corcoran Partners was solicited by Durchslag and other Winston & Strawn attorneys between August 8, 1989, and September 7, 1989.

■ In sum, the record in this case does not support defendant and contemnor's suggestion that Winston & Strawn imposed preliminary screening beyond Bruner and McCullough agreeing not to speak about the litigation with Durchslag. Nor is the record consistent with the suggestion that any action taken on August 7 or 8, 1989, was intended only as a preliminary measure pending full, effective screening.

Accordingly, even if screening were deemed timely if erected at the time the firm has *actual* knowledge of the problem, defendant and contemnor have failed to clearly and effectively show with objective and verifiable evidence that the screening in this case was timely.

### C

Finally, Dresser and contemnor contend that the interests of justice militate against disqualification of Winston & Strawn under the facts and circumstances of this case. Questions of fact are committed to the discretion of the trial court. This court will not reverse such a determination absent an abuse of discretion by the trial court. It is not sufficient that this court might disagree with the trial court on such a determination; rather, the trial court must have acted arbitrarily, without employing conscious judgment, or exceeded the bounds of reason and ignored established principles of law so that prejudice resulted. See *In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 326, 491 N.E.2d 894, 898.

Defendant and contemnor note that it is uncontroverted that Durchslag did not share Corcoran Partners' confidences with Winston & Strawn and will not do so in the future. Defendant and contemnor's reliance on the affidavits of Durchslag and the Winston & Strawn personnel representing Dresser, all of which state that no confidences were or will be disclosed, is misplaced. *La Salle* held that the trial court did not err in disqualifying the new firm where both the newly associated attorney and the partner at the new firm with responsibility for the litigation submitted affidavits stating that no confidences were disclosed. (See *La Salle,* 703 F.2d at 255, 259.) Likewise, affidavits similar to those at issue here were insufficient to warrant reversal in *Schiessle.* (See *Schiessle,* 717 F.2d at 419.) In a disqualification case where a firm, through one of its attorneys, attempted to represent a party adverse to a former client, the Seventh Circuit indicated that similar affidavits from firm members would not create a "Chinese wall." (*Analytica, Inc. v. N P D Research, Inc.* (7th Cir. 1983), 708 F.2d 1263, 1267.) The Seventh Circuit accepted the affidavits of members of an attorney's *former* firm in *Novo,* but, as noted above, the legal and ethical concerns may differ when reviewing disqualification of the attorney's new firm.

That affidavits may be insufficient to prevent disqualification in cases such as *La Salle, Schiessle, Analytica* and this case should not be surprising. Both the screening concept embodied in Illinois Rule 1.10(b) and the presumption of shared confidences at the new firm rely on the principle that clients deserve more than the mere assurances of the newly associated attorney and his new firm that confidences were not and will not be shared. (See G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct 192.1 (Supp. 1989).) It was within the discretion of the trial court to determine that the presumption in this case had not been clearly and effectively rebutted by objective and verifiable evidence, given the facts and circumstances in this case.

Defendant and contemnor note the size of Winston & Strawn and the undisputed fact that Durchslag's office is on a different floor from the offices of the attorneys representing Dresser. These facts may well be relevant to a determination of the propriety of a disqualification order. (See *Schiessle,* 717 F.2d at 421.) Defendant and contemnor also emphasize that Winston & Strawn has already devoted over 10,000 hours to the representation of defendant. However, the record indicates and defendant and contemnor admit in their brief that the trial court was aware of the inherently fact-

bound nature of the disqualification issue. The record indicates that defendant and contemnor presented these facts to the trial court. The trial court was persuaded by *La Salle* and *Schiessle*, in which large firms were disqualified despite these factors. In *Papanicolaou*, the Federal district court disqualified a firm that had performed almost 7,500 hours of work on behalf of its client. (*Papanicolaou*, 720 F. Supp. at 1086.) As noted earlier, the weight to be given to such evidence is a question of fact that falls within the discretion of the trial court. Based on the record presented in this case, we cannot say that the trial court abused its discretion in this regard.

Defendant and contemnor suggest that the disqualification motion was a tactical maneuver by noting that after the order was entered, plaintiffs did not object to Winston & Strawn representing defendant in settlement negotiations. However, a settlement negotiation is not binding on the parties in the absence of an agreement. The record indicates that plaintiffs in this case retained the option of going to trial after forcing defendant to hire new legal representation. Consequently, plaintiffs may have decided their ability to discontinue negotiations and insist on enforcement of the disqualification order protected them from the improper use of any confidences. Accordingly, the fact that plaintiffs did not object to a stay of enforcement in the limited context of settlement negotiations does not prove that the disqualification motion was made merely for purposes of delay or harassment.

Moreover, while we recognize that disqualification motions may be tactical, we also recognize that the word "tactical" means "pertaining to tactics" and that "tactic" is "[a]n expedient for achieving a goal." (See American Heritage Dictionary 1237 (2d college ed. 1982).) It is thus appropriate to focus on the substantive goal, rather than the form of the expedient.

In this vein, we further recognize that disqualification motions could be filed with the goal of harassment. Those who use a motion to harass may be subject to sanctions by the trial court. (134 Ill. 2d R. 137(b).) The determination of whether a motion is filed for improper purposes is within the sound discretion of the trial court. See *In re Estate of Smith* (1990), 201 Ill. App. 3d 1005, 1009, 559 N.E.2d 571, 573.

■ In this case, the record indicates that plaintiffs promptly notified contemnor of the potential conflict and requested disqualification. Contemnor's response indicated that he and his firm were not going to disqualify themselves and indicated only that contem-

nor and Durchslag would not speak about the substance of the litigation. Contemnor's response did not indicate that Durchslag would be isolated from confidences or secrets in this matter from any other source. Nor did it indicate that Durchslag had been isolated from contact with either Corcoran Partners or Dresser. Nor did it indicate that Durchslag and *the entire firm* of Winston & Strawn were precluded from discussing the litigation with each other. It was on this record, and without the benefit of affidavits subsequently prepared by Winston & Strawn personnel, that plaintiffs moved to disqualify contemnor and his firm. Defendant and contemnor argued to the trial court that the motion was filed for improper purposes. Based on this record, a trial court could conclude that the motion was not filed with the intention to harass defendant, contemnor or Winston & Strawn.

The argument essentially boils down to defendant and contemnor's assertion that "[h]ere, the equities lie with Dresser." Dresser may be significantly inconvenienced by having to retain new counsel in this litigation for reasons unrelated to Dresser's actions. It is not Dresser's fault that an attorney who apparently was involved in advising Corcoran Partners in the transaction joined Winston & Strawn. It is not Dresser's fault that Durchslag discussed the litigation with plaintiffs and their litigation counsel after Dresser had withdrawn its consent regarding Sidley & Austin's representation of Corcoran Partners. It is not Dresser's fault that neither Durchslag nor Winston & Strawn discovered the potential conflict before Durchslag joined the firm. It is not Dresser's fault that Winston & Strawn did not screen Durchslag from the litigation until the day the disqualification motion was filed—one month after the firm was put on actual notice of the problem.

Nor are any of the above facts traceable to the plaintiffs.

It is true that disqualification in this case may in some sense "punish" Dresser for the actions of Winston & Strawn. But if this rationale precludes disqualification in this case, it will preclude disqualification in almost every case; it is unlikely that a client will affirmatively seek to create the sort of situation presented in this appeal.

In sum, given the record on appeal in this case, the trial court did not err in disqualifying Winston & Strawn from further representing defendant in this litigation.

## IV

■ Finally, there is the matter of the contempt order. Defend-

ant and contemnor raised no defense on appeal other than attacking the underlying disqualification order. This court has previously upheld the imposition of a contempt fine where an attorney announced in court that he did not intend to abide by a proper disqualification order. (*Weglarz*, 128 Ill. App. 3d at 7-8, 470 N.E.2d at 27.) As the trial court did not err in disqualifying defendant's firm, the same conclusion appears to be warranted here.

However, cases such as *Weglarz* and this case demonstrate that contempt citations have been used to secure review of certain pretrial orders. (See also *Dunkin v. Silver Cross Hospital* (1991), 215 Ill. App. 3d 65, 69, 573 N.E.2d 848, 850 (discovery order).) Where the contemnor in such a case claims that he or she has acted in good faith and has not subjected the court to disdain or scorn, a reviewing court may view the circumstances of the case to determine whether the contempt citation should be vacated. See *Dunkin*, 215 Ill. App. 3d at 69, 573 N.E.2d at 850.

The transcript of proceedings dated April 16, 1991, expressly indicates that Bruner was acting at Dresser's request and indicates that Bruner sought the contempt finding merely to facilitate this appeal in good faith. The record does not indicate that contemnor held the trial court up to scorn or ridicule. Given the facts and circumstances of this case, we find that the contempt order and fine should be vacated.

For all of the aforementioned reasons, we affirm the March 13, 1990, judgment of the circuit court of Cook County disqualifying contemnor and the firm of Winston & Strawn from further representation of Dresser, vacate the April 16, 1991, contempt finding and order, and remand the case for further proceedings.

Affirmed in part; vacated in part and remanded.

MANNING, P.J., and BUCKLEY, J., concur.