WILLIAM A. SPENCER, Plaintiff-Appellant, v. RICHARD J. RIORDAN *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—90—3423

Opinion filed December 30, 1992.

Robert S. Minetz and Sarah S. Hirsen, both of Chicago, for appellant.

Riordan, Larson, Bruckert & Moore, of Chicago (Alan L. Fulkerson and Brian W. Norkett, of counsel), for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, William A. Spencer, filed a complaint against defendants, Richard J. Riordan and Gerald F. Fitzgerald. Count I of plaintiff's amended complaint was an action for a declaratory judgment in

which plaintiff alleged that defendants' additional payments to the partnership were loans to be repaid at the statutory interest rate. Count II of plaintiff's amended complaint was an action for injunctive relief in which plaintiff maintained that he would be irreparably harmed by the sale of a certain parcel of real estate because the proceeds of the sale would be distributed amongst the partners in an inequitable manner. Count III, an action for an accounting, and count IV, an action for breach of fiduciary duty, are still pending before the trial court. The trial court granted defendants' motion for summary judgment as to counts I and II of plaintiff's amended complaint. Plaintiff appeals the trial court's grant of summary judgment.

The following issues are before this court for review: (1) whether the trial court erred when it granted defendants' motion for summary judgment; (2) if we find that the trial court erred in granting defendants' motion for summary judgment, whether the payments in question constituted loans to the partnership; and (3) if we find that the payments in question are loans to the partnership, what interest rate must apply. We reverse.

In the fall of 1972, defendants and George Meyer were shown a parcel of undeveloped real estate on the Mediterranean coast near Vera, Spain. The real estate was known as Puerto Rey. Meyer then introduced defendants to Paul A. Polansky. Polansky proposed that the four men purchase Puerto Rey, petition local authorities to zone the area for more dense residential use, and then sell the rezoned property to a real estate developer for profit.

During the winter of 1972, Fitzgerald encountered Spencer. At that time, Spencer expressed an interest in participating in the purchase of Puerto Rey. Fitzgerald later learned that Meyer reduced the amount of his contribution. Fitzgerald then wrote to Spencer advising him that he would like to participate in the venture.

In January of 1973, defendants, Spencer and Polansky (American partners) signed a partnership agreement that was prepared by Riordan. The American partners agreed to "purchase, sell, lease, and mortgage" certain land located in Spain.

Paragraph 11 of the partnership agreement provides that the American partners are to share profits and losses in proportion to their contribution to the partnership capital. The American partners did not discuss how additional funds would be raised if more capital were needed for purposes of the partnership.

Paragraph 12 of the partnership agreement recites a capital account for Polansky of $168,000; a capital account for Spencer of $73,000; and capital accounts for defendants of $120,000 each. The

American partners funded their initial capital contributions with funds borrowed from the First National Bank of Chicago. The partnership purchased Puerto Rey with those funds. Puerto Rey was acquired by a Spanish concern known as Playa Puerto Rey, Sociedad Civil, an entity owned by the American partners, and represented by the law firm of Baker and McKenzie.

In March of 1973, the partnership agreement was amended to reflect that equal contributions were made by all of the partners. As amended, the partnership agreement reflected capital contributions of $121,000 by each partner.

Soon after the acquisition of Puerto Rey, Polansky obtained a zoning designation for the real estate which permitted dense residential use of the land. As a result, the partnership was authorized to build 2,800 residential units in Puerto Rey.

Additional capital contributions were raised in August of 1973. At that time, Polansky requested that the American partners contribute a total of $4,383, representing their share of the cost of architectural renderings submitted to Spanish officials at the zoning hearing. On August 30, 1973, Riordan mailed Polansky $2,922, representing an additional contribution of $1,461 each, from Fitzgerald and Riordan. Spencer sent Polansky a check for $1,461 under separate cover.

In addition, the partnership purchased a second parcel of Spanish realty known as Villa Ricos. Acquisition of Villa Ricos was funded by each partner's contribution of an additional sum to the partnership. However, the partnership agreement was not amended to reflect the additional contributions.

In 1976, Polansky advised the partnership that the Spanish Ministry of Housing required that development of Puerto Rey begin immediately in order to maintain the parcel's high density zoning designation. To comply with this requirement, the American partners decided to construct roads on the property at a cost of approximately $80,000. The cost of constructing the roads was paid in installments.

In February of 1976, defendants each paid their first installment of $5,681.81. Soon thereafter, Spencer sent Polansky his first installment of $5,681.81. The American partners then each paid a second installment of $8,100. In addition to constructing roads on Puerto Rey, the partners also obtained a survey of Villa Ricos. The cost of this survey was $2,700, and Riordan mailed a letter to each American partner requesting $675 for his respective share. Spencer paid his share. Following the contributions for the cost of constructing roads and obtaining the survey, each American partner had contributed $184,530 to the partnership, more than $63,500 in excess of the initial

capital contribution recited in the previous amendment to the partnership agreement.

Between 1973 and 1982, the American partners sought a purchaser for Puerto Rey. All efforts to sell the real estate, however, proved unsuccessful. As a result, the American partners entered into a written agreement to allow Polansky to construct 46 apartment units, a tavern and a restaurant. The complex was to be situated on a beachfront area, and the American partners were hopeful that the development would make the remainder of the property more attractive to potential purchasers. The agreement required Polansky to pay the purchase price of the land from the closing proceeds on the sale of each apartment unit or by February of 1983, whichever occurred earlier.

The apartments were not sold as quickly as Polansky had expected, and he requested that the American partners grant him an extension of the February 1983 payment deadline. In January of 1983, the American partners agreed to allow Polansky an additional six months to pay for the property. At that time, no partner was willing to sell his interest in Puerto Rey merely for the total of his capital contribution.

In October of 1983, Polansky mailed Riordan $37,412.50 representing proceeds from the sale of the part of Puerto Rey on which Polansky built the apartments and bar. Riordan paid each American partner $12,470.83 and debited the partners' capital accounts in an equal amount.

Construction of the apartments and bar did not attract the attention of potential investors. In 1983, the local Spanish Housing Minister refused to tender occupancy permits for the development unless the partners agreed to construct a sea wall. In April of 1984, Polansky received a written notice from the Spanish Housing Ministry that all further construction at Puerto Rey must cease, and that no occupancy permits would be issued until after the sea wall was constructed. Polansky informed the American partners of this action in May of 1984.

Riordan later wrote to Fitzgerald and Spencer. Riordan's letter indicated that the cost of the sea wall would be approximately $48,875 for each American partner, and he requested a meeting of the American partners to discuss the matter. The American partners met in the summer of 1984. Defendants decided that a wall should be built. Spencer did not consent to the building of the sea wall with partnership funds. In December of 1984, Riordan received a letter from Polansky describing his lack of success in selling Puerto Rey and in lo-

cating a contractor willing to construct a sea wall in exchange for an interest in the partnership. The American partners eventually hired a contractor to construct the sea wall.

On January 29, 1985, Polansky sent Riordan a telex informing him that the contractor who constructed the sea wall would place the equivalent of a mechanic's lien on Puerto Rey, and thereafter foreclose on the lien if the February installment on the sea wall was not paid. Riordan immediately forwarded copies of the telex to Fitzgerald and Spencer. Thereafter, defendants made additional payments to the partnership to finance construction of the sea wall. Spencer did not contribute to the cost of constructing the sea wall notwithstanding defendants' requests. Between February and June of 1985, defendants each contributed $47,066 to the partnership in order to finance the first four installments of the cost of constructing the sea wall. The contributions made by defendants included two-thirds of the shortfall created by Spencer's failure to contribute. Polansky contributed the remaining one-third of that shortfall.

In May of 1985, defendants travelled to Spain for the purpose of meeting Polansky. When they returned from Spain, Riordan wrote Spencer concerning his contribution to the cost of constructing the sea wall. Riordan told Spencer that the remaining American partners intended to make the contributions necessary to fund construction of the sea wall, and that if Spencer did not contribute, his share of partnership profits would be diminished. Riordan's letter read:

"Enclosed is a copy of the brief minutes which were taken by Paul Polansky's secretary at one of the meetings we held a Paul's home in Cortijo Grande. You will note the second paragraph with respect to your contribution to the cost of the wall. The 18%-27% shareholdings were estimated based upon what we believed would be the total expenditure for the wall. However, the position of the three of us is that the shareholdings will be rearranged when all of the costs and payments are known but we estimate that the percentages will be approximately as described in those minutes.

　　　＊＊＊

＊＊＊ [N]one of us want to increase our participation in Puerto Rey ＊＊＊. ＊＊＊ [A]ll of us would *much rather* see you make the payments than to rearrange the shareholdings." (Emphasis in original.)

Despite this letter from Riordan, Spencer did nothing.

Later, on August 28, 1985, defendants and Spencer held a meeting in Fitzgerald's office to discuss the sea wall and Spencer's partici-

pation in the cost of constructing said wall. At the meeting, Spencer indicated that he would make a decision concerning his contribution to the cost of this project within one week. Between October of 1985 and February of 1986, Fitzgerald and Riordan each contributed an additional $62,250 to the partnership in order to finance construction of the sea wall. Again, Spencer contributed nothing. Spencer did not inform defendants that he did not intend to contribute.

In February of 1987, Riordan mailed an accounting for the Puerto Rey parcel to Fitzgerald and Spencer. The accounting reflected that the interests of the American partners had been adjusted. Spencer's share had been reduced while Riordan's and Fitzgerald's shares were increased. Spencer did not dispute the accuracy of each partner's contribution as set forth in the accounting. Spencer neither discussed the accounting with either Fitzgerald or Riordan, nor did he seek a judicial determination that the adjustment of the partnership interests was improper. Defendants adjusted the ownership percentages for Puerto Rey from 33.3% for each partner to 40.52% for Fitzgerald and Riordan, and 18.96% for Spencer.

One year later in April of 1988, Riordan wrote Fitzgerald and Spencer to advise them that Puerto Rey had been sold. In his letter, Riordan noted that the purchase price for the parcel was $1,500,000, and that he had received a down payment of $100,000. The sale was completed in August of 1988, and the proceeds totalling $1,401,992.84 were distributed in the following manner: The costs of sale were $42,232.42; Fitzgerald received $543,368.21; Riordan received $543,368.21; and Spencer was given $273,024.

On June 28, 1899, Spencer brought this lawsuit. Pursuant to an agreed order, the remaining $98,007.16 ($1,500,000-$1,401,992.84) was placed in escrow pending the result of this litigation. Thereafter, the parties filed cross-motions for summary judgment.

On November 27, 1990, the trial court entered an order denying Spencer's motion for summary judgment, granting defendants' motion for summary judgment, and directing that the escrow, including accumulated interest, be distributed in the following manner: $51,054.56 to Fitzgerald; $51,054.56 to Riordan; and $6,639.18 to Spencer. In addition, the trial court found that defendants' additional payments were capital contributions to increase their percentage of ownership in the partnership, and that their additional payments should not be treated as loans. On November 29, 1990, Spencer filed a notice of appeal.

The first issue before this court is whether the trial court erred when it granted defendants' motion for summary judgment. Defend-

ants contend that the trial court's grant of summary judgment was proper because their additional payments to the partnership to finance construction of the sea wall constituted partnership contributions which increased their percentage of ownership and decreased plaintiff's percentage of ownership. Plaintiff maintains that the trial court erred when it granted defendants' motion for summary judgment because defendants' additional payments were loans to the partnership which must be repaid at the statutory interest rate.

Summary judgment is appropriate only when the pleadings, depositions, admissions and affidavits in the record present no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005; *Palomar v. Metropolitan Sanitary District of Greater Chicago* (1992), 225 Ill. App. 3d 182, 188; *Village of Glenview v. Northfield Woods Water & Utility Co.* (1991), 216 Ill. App. 3d 40, 47, 576 N.E.2d 238, 243.) When all parties file for summary judgment, the court is invited to decide the issues thus presented as a question of law and the entry of summary judgment for one party or the other is proper. *In re Estate of Bresler* (1987), 159 Ill. App. 3d 535, 540, 510 N.E.2d 1057, 1060.

■ An appellate court must take a deferential approach to the findings made below on disputed factual issues; however, "the scope of our review on questions of law is independent, not deferential." (*Havens v. Miller* (1981), 102 Ill. App. 3d 558, 567, 429 N.E.2d 1292, 1298.) The correctness of a ruling on a question of law may be determined on appeal independent of the trial court's judgment. *Crum v. Gulf Oil Corp.* (1979), 70 Ill. App. 3d 897, 899, 388 N.E.2d 1008, 1011.

In the present case, the material facts are not disputed. All parties concede that plaintiff did not contribute to the cost of constructing the sea wall. The legal result of this undisputed fact is solely a question of law. Accordingly, we will review the record and make an independent determination as to how the payments made by defendants should be construed.

We find that the trial court erred when it granted defendants' motion for summary judgment. Additional payments made by defendants must be treated as loans to the partnership.

■ Section 18 of the Uniform Partnership Act (Act) states in relevant part:

"18. Rights and duties of partners inter se

§18. The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(a) Each partner shall be repaid his contribution, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.

(b) The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property.

(c) A partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance.

(d) A partner shall receive interest on the capital contributed by him only from the date when repayment should be made." Ill. Rev. Stat. 1985, ch. 106½, par. 18(a) through (d).

In addition, paragraph 5 of the partnership agreement states:

"5. The management of the Partnership shall reside exclusively in the partners and all decisions shall be taken by unanimous vote, provided, however, that the partners may, from time to time, designate and empower one or more partners to perform specific acts on behalf of this Partnership."

Furthermore, paragraph 11 of the partnership agreement provides:

"11. The net income of this Partnership shall be distributed to each partner in the proportion that his capital contribution bears to the total capital contribution of all partners. Losses shall be borne in the same proportion."

The partners did not vote unanimously to build the sea wall, to make additional contributions to finance construction of the wall, or to reduce plaintiff's one-third interest. These actions were undertaken by defendants without plaintiff's consent. Defendants asked plaintiff to consent to the building of the sea wall using partnership funds on numerous occasions. Defendants also asked plaintiff to contribute funds to pay for the building of the sea wall. Plaintiff never consented to the building of the sea wall with partnership funds, and he never agreed to contribute funds to pay for construction of said wall. In addition, plaintiff never agreed to reduce his percentage interest because defendants advanced funds for construction of the sea wall. The partnership agreement does not have a provision requiring partners to make additional contributions under any circumstances.

Furthermore, the partnership agreement does not state that a partner's percentage interest will be reduced upon his refusal to make additional contributions. Accordingly, the trial court's grant of summary judgment violated section 18 of the Act and paragraph 5 of the partnership agreement. The interest drawn on defendants' advances should be computed at the interest rate of 5% pursuant to section 2 of the Interest Act. Ill. Rev. Stat. 1985, ch. 17, par. 6402.

We are not persuaded by defendants' argument that plaintiff's claim is barred by the doctrine of acquiescence by silence. "It has generally been held that no waiver is occasioned by *** mere silent acquiescence, especially where it does not appear that the [silent party] understood that there was a waiver or that he relied thereon in proceeding to do the act claimed as a forfeiture." (*Village of Lake Bluff v. Dalitsch* (1953), 415 Ill. 476, 483, 114 N.E.2d 654, 659.) "[A] person is not estopped by his silence when there is no positive duty or opportunity to speak ***." *Merchants National Bank v. Frazier* (1946), 329 Ill. App. 191, 206, 67 N.E.2d 611, 619.

The doctrine of acquiescence by silence is inapplicable to the present case. It is undisputed that defendants in the present case knew that plaintiff did not consent to contribute to the cost of building the sea wall or to their decision to reduce his partnership percentage. Plaintiff had no duty to inform his partners that they could not build the sea wall or change his partnership share without his consent. Defendants knew that the partnership agreement required that these actions be taken only upon unanimous consent of the partners. Plaintiff's silence coupled with defendants' letters did not impose a duty upon plaintiff to respond or forfeit his rights. Instead, defendants' actual knowledge of plaintiff's refusal to consent is controlling.

Accordingly, we rule that the trial court erred when it granted defendants' motion for summary judgment. Defendants' payments constituted loans to the partnership for which they are entitled to receive interest at five percent per annum. Defendants' were not entitled to increase their percentage interest in the partnership.

For the aforementioned reasons, we reverse the judgment of the circuit court.

Reversed.

GREIMAN, P.J., and TULLY, J., concur.