INTERNATIONAL INSURANCE COMPANY, Plaintiff and Counterdefendant-Appellant, v. THE CITY OF CHICAGO HEIGHTS *et al.*, Defendants and Counterplaintiffs-Appellees.

First District (5th Division)   No. 1—92—1493

Opinion filed November 18, 1994.

Terry M. Weyna and Jamie S. Freveletti, both of Burditt & Radzius, Chartered, of Chicago, for appellant.

Kai A. Nebel, James J. Casey, and Kathleen M. O'Laughlin, all of Keck, Mahin & Cate, of Chicago, for appellees.

JUSTICE GORDON delivered the opinion of the court:[1]

---

[1] To comply with the appellate court page limitations specified by revised Supreme Court Rule 23 (Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23, eff. July 1, 1994), portions of this decision have been abridged and deleted for purposes of publication. The entire unabridged decision is contained in the Rule 23 order filed with the clerk of this court in the cause of *International Insurance Co. v. City of Chicago Heights*, docket No. 1—92—1493.

## BACKGROUND

International Insurance Company (International) filed a declaratory judgment action in the circuit court of Cook County against the City of Chicago Heights, several of its employees, and one of its agents (collectively Chicago Heights) on December 9, 1988. It sought a declaration of its obligations under a public officials and employees liability policy issued to Chicago Heights. Specifically, International sought a determination of its liability to indemnify Chicago Heights for legal fees resulting from seven lawsuits filed against it. Six of the seven underlying suits alleged that Chicago Heights enforced building codes in a racially discriminatory manner to force African-Americans and Hispanics from Chicago Heights. The seventh alleged that Chicago Heights razed a building in violation of the owner's constitutional rights but alleged no discriminatory enforcement of building codes.

Chicago Heights filed a counterclaim in International's declaratory judgment action, alleging breach of contract, waiver, and estoppel. It subsequently filed a motion for summary judgment, arguing that the policy obligated International to indemnify its legal fees in each of the underlying suits and to indemnify its legal fees in this declaratory judgment action. International filed a cross-motion for summary judgment, contending primarily that policy exclusions precluded coverage. On October 31, 1991, the trial court granted Chicago Heights' motion for summary judgment and later awarded damages of $878,457.71; the court awarded $573,566.89 for legal fees in the seven underlying suits and $304,890.82 for Chicago Heights' legal fees in this coverage litigation. For the reasons discussed below, the circuit court's judgment is affirmed in part and reversed in part.

## FACTS

The International public officials and employees liability policy issued to Chicago Heights covered losses arising from enumerated wrongful acts. The policy defined "wrongful act" to include "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including misfeasance, malfeasance and nonfeasance by an insured as public official or employee of the public entity." It further provided that "loss" "shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions." The policy, however, did not impose a duty to defend on International but specified in policy condition 5 that "[i]n the event of a claim, the Insureds shall take reasonable measures to protect their interests. If defense of a suit shall be required then the insured shall appoint counsel."

Although International acknowledged that the coverage could

include civil rights claims, including claims for discriminatory enforcement of statute or ordinance, its coverage defense in each of the seven underlying suits was predicated on two policy exclusions, exclusion 5.b., for claims based on property damage, and exclusion 6.d., for claims based on wrongful entry or eviction. Exclusion 5.b. provides:

> "The Company shall not be liable to make payment for Loss in connection with any claim made against the Insureds allegedly, based upon or arising out of any one or more of the following:
> * * *
> 5.b. loss or criminal abstraction of, damage to or destruction of any tangible property or the loss of use of such property ***."

Exclusion 6.d. provides:

> "The Company shall not be liable to make payment for Loss in connection with any claim made against the Insureds allegedly, based upon or arising out of any one or more of the following:
> * * *
> 6.d. wrongful entry or eviction or other invasion of the right of private occupancy ***."

The International policy also provided, in policy condition 14, that its coverage was excess to any other policy insuring a loss covered under its policy, stating:

> "14. Other Insurance
> If the public Entity or any Insured has other insurance insuring a Loss covered by this Policy, the insurance provided by this Policy shall apply in excess of such other insurance."

In addition to its policy with International, Chicago Heights also maintained two policies which provided coverage for the claims at issue here. The first was a general liability policy issued by the Insurance Corporation of Ireland (ICI). That policy provided coverage for property damage and wrongful eviction. The Governmental Interinsurance Exchange (GIE) issued the second policy, which provided coverage for violations of civil rights. The GIE policy expressly provided that its coverage was excess to that provided under International's policy. Both the ICI and GIE policies provided that each had a duty to defend Chicago Heights.

Between 1984 and 1988, seven civil rights lawsuits were brought against Chicago Heights. In six of the seven underlying actions, the respective plaintiffs alleged that Chicago Heights violated their constitutional rights by engaging in a conspiracy to force minorities from Chicago Heights through discriminatory enforcement of building codes. In the seventh, the plaintiff alleged that Chicago Heights violated his constitutional rights by razing his building

without affording him due process.[2] In six of the seven underlying cases, Chicago Heights retained the law firm of Keck, Mahin & Cate (Keck) to represent it in addition to whatever counsel were already provided.

We note here that Keck, Mahin & Cate corresponded with International from the inception of its representation of Chicago Heights in the underlying actions, advising it both that it represented Chicago Heights and of the status of those actions. In a letter to International's coverage counsel dated August 19, 1987, Keck further advised International that ICI also provided a defense on Chicago Heights' behalf in the *Schak* and *Atkins* suits, and that GIE also provided a defense on Chicago Heights' behalf in the *Cepela*, *Dale* and *Urban* actions. In a letter dated January 15, 1988, International's coverage counsel requested that Keck provide it with billing statements for its legal services in each of those six underlying suits.

At the time this declaratory judgment action was filed, eight different lawsuits were pending against various defendants insured by International in which Keck was retained by International to represent those insured parties. Those actions were apparently unrelated to any of the parties or issues involved in this coverage action. Certain Keck attorneys, absorbed from the law firm of Karon, Savikas & Horn (hereinafter Karon), had earlier represented International in coverage matters during their previous affiliation. International asserts that those attorneys learned confidential information about International, including information about its coverage and exclusions, its criteria for raising coverage issues, and its strategies for litigation and settlement of coverage claims. In July 1988, International learned that these former Karon attorneys might join Keck, Mahin & Cate. At that time it met with Keck and these former Karon attorneys to discuss the problem of possible conflicts of interest. At that meeting, International agreed to waive any right to compel disqualification of Keck in two cases unrelated to this appeal but reserved its right to compel Keck's disqualification because of any other conflicts of interest.

Keck asserted that from the inception of this coverage action in 1988 it implemented an institutional screening procedure pursuant to which any Keck attorney formerly associated with the Karon firm was screened from contact with this coverage litigation. In December 1989, more than one year after this declaratory judgment action was filed and more than 16 months after Keck's absorption of the former

---

[2]For complete discussion of the facts in the underlying lawsuits, see the unabridged decision referred to in footnote 1 *supra*.

Karon attorneys, International's attorneys requested by letter that Keck withdraw from this coverage litigation because of a possible conflict of interest arising from Keck's simultaneous representation of International insureds, and because of the confidential information which the former Karon attorneys learned when they represented International. Keck declined this request.

On March 29, 1990, International filed a motion to disqualify Keck in this declaratory judgment action because of the alleged conflict of interest. Without determining whether an actual conflict existed, the trial court denied International's motion to disqualify, finding that it waived any right to compel Keck's disqualification. In denying International's motion the court stated:

> "This Court finds it incredible that International had no knowledge of the alleged conflict until late 1989. This Court finds International knew or should have known of Keck's role in this litigation from its onset. Coupled with International's earlier knowledge of the Karon attorneys joining the Keck firm and its allowing cases to be transferred to Keck despite knowing Keck was representing interests contrary to International's in two other matters. International accepted Keck's assurances that screening procedures would be implemented to protect International from any conflict of interest.
>
> Having determined that International knew of Keck's role in the instant litigation more than one year prior to raising its objections this Court finds it disingenuous that International is suddenly dissatisfied with Keck's screening methods which it agreed to in two other actions in which Keck represented a party opposing International's interests.
>
> This Court finds that International's objection is untimely, and that to disqualify the Keck firm as counsel for [Chicago Heights] would be a severe and unjust hardship on that party."

On appeal, International contends as follows: (1) that the trial court erred in finding that neither exclusion 5.b. or 6.d. nor policy condition 14 or 5 precluded coverage of the underlying suits; (2) that the trial court abused its discretion in awarding Chicago Heights the full amount of the attorney fees it sought for the underlying actions;[3] (3) that the trial court abused its discretion in awarding Chicago Heights attorney fees incurred in this declaratory judgment action; and (4) that the trial court abused its discretion in finding that

---

[3]Because of the page limitation imposed by revised Supreme Court Rule 23, the discussion of the issues raised by this second contention has been deleted for purposes of publication but may be found in the unabridged decision contained in the Rule 23 order referred to in footnote 1 *supra*.

International waived any objection to a possible conflict of interest arising from Keck, Mahin & Cate's representation of Chicago Heights in this coverage litigation. For the reasons stated below, we affirm in part and reverse in part.

OPINION

COVERAGE OF THE UNDERLYING CLAIMS

We note at the outset that in considering International's appeal of the circuit court's grant of summary judgment in favor of Chicago Heights, this court, as in all appeals from a summary judgment, must provide the appellant with a *de novo* review. (*Country Mutual Insurance Co. v. Anderson* (1993), 257 Ill. App. 3d 73, 77-78, 628 N.E.2d 499, 502; *Rayner Covering Systems, Inc. v. Danvers Farmers Elevator Co.* (1992), 226 Ill. App. 3d 507, 510, 589 N.E.2d 1034, 1036.) Additionally, we note that summary judgment is appropriate only in the absence of any genuine issue of material fact and where the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1992); see also *In re Estate of Hoover* (1993), 155 Ill. 2d 402, 410-11, 615 N.E.2d 736, 739-40.

International concedes that the plaintiffs in the seven underlying suits alleged potentially covered civil rights violations, but contends that the underlying facts in those cases invoke policy exclusions. Specifically, it first argues that exclusion 5.b. (property damage) precludes coverage of the legal fees Chicago Heights incurred in the *Schak, Cogdell, Urban* and *Gutierrez* lawsuits because those suits arose out of damage to tangible property. It argues next that exclusion 6.d. (wrongful entry or eviction) precludes coverage of all seven of the underlying lawsuits.

International invites our attention to cases where courts in other jurisdictions have held that insurance policies excluded civil rights claims from coverage because of policy exclusions similar to those involved in this case. For example, in *Town of Springfield v. United States Fidelity & Guaranty Co.* (2d Cir. 1986), 794 F.2d 802, the Second Circuit held that a policy provision excluding from coverage "any damages, direct or consequential, *** arising from *** damage to any tangible property" excluded from coverage damages the underlying plaintiff sought in a section 1983 action. (794 F.2d at 804.) In *Springfield*, the insured municipality demolished the top story of a fire-damaged building. (794 F.2d at 804.) The building's owners subsequently sued the municipality for damages under section 1983, alleging that the demolition constituted a taking without just compensation and a denial of due process. (794 F.2d at 804.) The

municipality subsequently tendered the suit to its insurer which declined either to defend or indemnify it because of the property damage exclusion. 794 F.2d at 804.

The Second Circuit held that the policy's property damage exclusion shielded the insurer from liability in the section 1983 action. It found that a reasonable reading of the property damage exclusion precluded coverage of the property owners' section 1983 claims because "without the property loss, there could have been no claim of an unconstitutional taking." 794 F.2d at 806.

International also offers *Engsberg v. Town of Milford* (W.D. Wis. 1984), 597 F. Supp. 251. In *Engsberg*, a town constable shot five dogs belonging to the underlying plaintiff. That plaintiff subsequently sued the constable and his employer, the Town of Milford, under section 1983, alleging violations of his fourth, fifth, and fourteenth amendment rights. (597 F. Supp. at 253.) Milford tendered the defense of that suit to its insurer, but the insurer declined to provide a defense because of a policy exclusion which denied coverage for any claims "arising from a Wrongful Act from which no damages would have resulted except for the occurrence of *** damage to any tangible property." 597 F. Supp. at 254.

Applying Wisconsin law, the district court in *Engsberg* held that the property damage exclusion precluded coverage of the underlying plaintiff's section 1983 suit. Even though the underlying plaintiff in *Engsberg* sought damages for civil rights violations rather than property damage, those "[civil rights] damage claims would be nonexistent had the damage to tangible property not occurred." 597 F. Supp. at 254.

*Continental Casualty Co. v. City of Richmond* (9th Cir. 1985), 763 F.2d 1076, is instructive because the court there discusses possible constructions of "arising from." In *Richmond,* an arrestee died from injuries he received while in the custody of the Richmond, California, police. The arrestee's heirs sued under section 1983 and Richmond tendered the suit to its public officials liability insurer. (763 F.2d at 1078.) That policy excluded from coverage claims "arising directly or consequentially from bodily injury *** or death ***." 763 F.2d at 1079.

The court in Richmond construed "arising from" to have broader meaning than simply denoting causation. The court found "arising from" to more properly mean " 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with.' " (763 F.2d at 1080, quoting *Underwriters at Lloyd's of London v. Cordova Airlines, Inc.* (9th Cir. 1960), 283 F.2d 659, 664.) In holding that the policy exclusion denied coverage for the

heirs' section 1983 suit, the court stated that "the very existence of the heirs' *** claim *** depends upon there being an identifiable injury to [the decedent]." 763 F.2d at 1081.

Similarly, in a case applying Illinois law, the Seventh Circuit in *United National Insurance Co. v. Entertainment Group, Inc.* (7th Cir. 1991), 945 F.2d 210, refused to give a narrow construction to the phrase "arising from." In *Entertainment Group*, a theater patron was sexually assaulted on the theater's premises after a show. In her suit against the theater, she alleged that the assault occurred because of the theater's negligence. (945 F.2d at 211.) The theater's insurance policy, however, excluded from coverage all claims "arising out of an assault and/or battery." (945 F.2d at 212.) The insured in *Entertainment Group* urged that the assault and battery exclusion applied only when the underlying suit explicitly stated a cause of action for assault or battery; since the underlying plaintiff alleged only negligence, the exclusion therefore could not apply. (945 F.2d at 213.) The court found that the assault and battery exclusion clearly excluded all claims arising from an assault or battery, regardless of whether the insured's negligence could have been a contributing cause of the injury. (945 F.2d at 214.) The court held that because the plaintiff's injuries clearly "originated in, or arose from," a sexual assault, the policy's assault and battery exclusion precluded coverage. 945 F.2d at 214.

In each of the foregoing cases, the underlying plaintiffs would have had no cause of action if the excluded property damage or bodily injury had not been sustained. For example, the civil rights plaintiffs in *Springfield, Engsberg,* and *Richmond* would have had no cause of action against the insured municipalities apart from the excluded property damage or the excluded bodily injury. Since no claim or cause of action could be maintained without seeking recovery for the excluded property damage or bodily injury, such claim or cause of action, regardless of the legal theory interposed, may be said to have arisen from the excluded damage or injury. Similarly, the negligence plaintiff in *Entertainment Group* would have had no cause of action against the insured theater if the sexual assault which the policy excluded from coverage had not occurred. Consequently, the underlying plaintiff's cause of action was properly characterized as arising from the assault and therefore was excluded from coverage.

The cases discussed above suggest that policy exclusions in the nature of property damage or personal injury exclusions, or for that matter exclusions for wrongful eviction, may preclude coverage of many civil rights claims because of the "arising from" language included in them. However, those cases are factually distinguishable

from each of the underlying lawsuits involved here with the exception of one, the *Gutierrez* suit.

■ With respect to three underlying actions here, the *Schak*, *Cogdell* and *Urban* suits, even if property damage, the demolition of buildings or damage due to vandalism because of the alleged withdrawal of police and fire services, had not occurred, the underlying plaintiffs still would have had civil rights claims against Chicago Heights based on its alleged discriminatory enforcement of its building code. The underlying complaints in these three cases alleged that Chicago Heights officials conspired to drive minorities from Chicago Heights by discriminatorily enforcing building codes. All three complaints alleged that Chicago Heights building inspectors cited the underlying plaintiffs for groundless building code violations or declared their buildings uninhabitable as part of the conspiracy; the complaints in *Schak* and *Cogdell* further alleged that Chicago Heights failed to give required notice of the alleged violations as part of that conspiracy.

Given the foregoing, we cannot say that the claims in the *Schak*, *Cogdell* and *Urban* cases arose from property damage because the underlying plaintiffs' civil rights causes of action would have remained viable even if property damage had not occurred. (See *National Advertising Co. v. City of Chicago* (N.D. Ill. 1991), 788 F. Supp. 994, 998-99 (stating that a claim of discriminatory enforcement of an ordinance based on an invidious classification can support a section 1983 claim); *Bennett v. Village of Oak Park* (N.D. Ill. 1990), 748 F. Supp. 1329, 1335-36 (stating that selective enforcement of a statute based on impermissible considerations such as race can support a section 1983 claim).) We also note that in both the *Schak* and *Cogdell* cases, the underlying counterplaintiffs' and plaintiff's buildings were demolished *after* the complaints were filed, confirming that neither claim arose from property damage.

■ In one of the underlying cases, however, *Gutierrez*, the underlying plaintiff's claim of a civil rights violation arose entirely from the demolition of his house and the personal property it contained. He alleged no racially discriminatory enforcement of building codes. If Gutierrez's house had not been razed, he would have had no section 1983 cause of action against Chicago Heights. Consequently, we find that the trial court erred in granting summary judgment on the coverage issue to Chicago Heights with respect to the *Gutierrez* case because exclusion 5.b. precluded coverage of any claims arising from that suit.

The same rationale which we have applied to the application of exclusion 5.b applies to exclusion 6.d, which purports to preclude

coverage for damages arising from "wrongful entry or eviction or other invasion of the right of private occupancy." According to International, all seven of the underlying plaintiffs based their claims on Chicago Heights' posting of their property as uninhabitable. It argues that the postings had the effect of evicting residents and that, but for the postings and the subsequent notices from Chicago Heights officials to vacate, none of the underlying civil rights claims could have been maintained.

International and Chicago Heights concur that exclusion 6.d. precludes coverage of claims arising from wrongful entries or evictions. They agree with the construction given to language identical to that of exclusion 6.d. in *Martin v. Brunzelle* (N.D. Ill. 1988), 699 F. Supp. 167. In *Martin*, the district court held that, under the *ejusdem generis* principle of construction, the words " '[o]ther invasion of the right of private occupancy' *** encompass actions of the same general type as, though not specifically embraced within, 'wrongful entry or eviction.' " (699 F. Supp. at 170.) The parties further agree that since no wrongful entries are alleged to have occurred in the underlying actions, Chicago Heights would have had to evict tenants to invoke exclusion 6.d.

International and Chicago Heights disagree whether the postings and the notices to vacate amounted to actions in the nature of evictions. Generally, only a landlord can effect an eviction. (See 24 Ill. L. & Prac. *Landlord & Tenant* § 342, at 396 (1980); 52 C.J.S. *Landlord & Tenant* § 448, at 294 (1968).) However, where the acts of public officials by which a tenant is injured "are either affirmatively procured by the landlord or are due to his fault in not performing his duties," such acts may amount to an eviction. 52 C.J.S. *Landlord & Tenant* § 449, at 299 (1968).

■ We note that none of the underlying actions allege that Chicago Heights ever instituted formal eviction proceedings and that International does not maintain that such formal proceedings were ever instituted. However, we need not decide whether Chicago Heights' acts amounted to evictions, even assuming that the postings and notices to vacate could be construed as evictions because the civil rights causes of action asserted in the underlying complaints would have nonetheless remained viable based on their allegations of discriminatory enforcement of the building code. Consequently, the underlying claims cannot be said to have arisen from any such evictions.

Manifestly, Chicago Heights could legally enforce its building code and thus could legally post properties for violating that code where it acted in good faith to enforce actual violations. Indeed, a

statute required it to do so. (See Building Code Violation Notice Posting Act (50 ILCS 810/2 (West 1992)).) However, as stated above, with the exception of Gutierrez, each of the underlying plaintiffs in the instant case alleged that Chicago Heights officials falsely cited his or her building for building code violations or declared them uninhabitable as part of a conspiracy to drive minorities from Chicago Heights; four alleged that Chicago Heights failed to give required notice of the alleged violations as part of that conspiracy; and two alleged wrongful denial of permission to repair the alleged violations, also as part of that conspiracy. Thus, even if there were no postings or notices to tenants to vacate, the wrongful citations, the failure to give notice, and the denial of permission to repair, if true, would have remained, thereby providing an independent basis for the underlying claims.

In granting summary judgment in favor of Chicago Heights, the trial judge stated that "[t]he claims in each of the underlying actions are, in essence, claims for constitutional violations ... each and every claim arises from alleged racial discrimination by the Chicago Heights insureds." With the exception of *Gutierrez,* we agree that the essence of each of the underlying cases was an alleged attempt to implement racially discriminatory practices through unwarranted enforcement of the municipal building code. These cases do not present situations where constitutional violations arose from property damage or an interference with possessory rights in realty. If anything, under these allegations, property damage or interference with possessory rights in realty, if present, would have evolved from a racially motivated scheme to violate the underlying plaintiffs' civil rights. As such, neither exclusion 5.b. nor 6.d. should apply to preclude coverage.

International next challenges the circuit court's award of $304,890.82 to Chicago Heights for the legal fees paid to Keck, Mahin & Cate for its services in this coverage litigation. It contends that an insured may not recover attorney fees incurred in a coverage action even where the insured prevails on the merits.

In a series of decisions we have held that an insured may not recover attorney fees incurred in prosecuting a declaratory judgment action for coverage against his insurer absent a showing that the insurer acted vexatiously. (See *Tuell v. State Farm Fire & Casualty Co.* (1985), 132 Ill. App. 3d 449, 454, 477 N.E.2d 70, 74; *Reis v. Aetna Casualty & Surety Co.* (1978), 69 Ill. App. 3d 777, 789-90, 387 N.E.2d 700, 709; *Brown Bag Co. v. Bituminous Casualty Corp.* (1969), 117 Ill. App. 2d 287, 295-96, 254 N.E.2d 577, 581.) In *Brotherhood Mutual Insurance Co. v. Roseth* (1988), 177 Ill. App. 3d 443, 532 N.E.2d 354, we

reasoned that since an insured could not recover attorney fees and costs for bringing a declaratory judgment action against an insurer absent a showing of vexatiousness, it logically followed that an insured could not recover attorney fees and costs for defending a declaratory judgment action brought by an insurer absent vexatiousness. *Roseth*, 177 Ill. App. 3d at 453, 532 N.E.2d at 360-61.

The single case of *Trovillion v. United States Fidelity & Guaranty Co.* (1985), 130 Ill. App. 3d 694, 474 N.E.2d 953, appears to deviate from this line of cases, at least where the insurer is shown to have breached its duty to defend. (See *Trovillion*, 130 Ill. App. 3d at 700-01, 474 N.E.2d at 958.) Although certain Federal opinions have followed *Trovillion* in applying Illinois law (see *National Cycle, Inc. v. Savoy Reinsurance Co.* (7th Cir. 1991), 938 F.2d 61, 64; *Green v. J.C. Penney Auto Insurance Co.* (7th Cir. 1986), 806 F.2d 759, 765-66), those cases are not persuasive, and in *Roseth* we expressly declined to follow *Trovillion.* See *Roseth*, 177 Ill. App. 3d at 453, 532 N.E.2d at 360-61.

■ Although Chicago Heights urges us to follow *Trovillion,* we decline to do so given *Roseth* and the substantial body of case law underlying its expansion of the then-existing rule. (See *Tuell*, 132 Ill. App. 3d at 454, 477 N.E.2d at 74; *Reis*, 69 Ill. App. 3d at 789-90, 387 N.E.2d at 709; *Brown Bag*, 117 Ill. App. 2d at 295-96, 254 N.E.2d at 581.) This approach denying the insured recovery of its attorney fees incurred in coverage litigation comports with both the general rule that successful litigants may not recover fees or costs absent a statute or agreement authorizing such a recovery (see *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 166, 390 N.E.2d 859, 865; *Hamer v. Kirk* (1976), 64 Ill. 2d 434, 437, 356 N.E.2d 524, 525) and the longstanding policy of encouraging insurers to bring declaratory judgment actions when coverage is in doubt. See *Pekin Insurance Co. v. Home Insurance Co.* (1985), 134 Ill. App. 3d 31, 34-35, 479 N.E.2d 1078, 1081; *Sims v. Illinois National Casualty Co.* (1963), 43 Ill. App. 2d 184, 199, 193 N.E.2d 123, 130.

Moreover, even if *Trovillion* were followed, it would not apply here because it is predicated on the insurer's breach of its duty to defend. (See *Trovillion*, 130 Ill. App. 3d at 700-01, 474 N.E.2d at 958.) As previously pointed out, the International policy involved here does not impose any such duty to defend on International but, rather, only a duty to indemnify.

Chicago Heights asserts that, even under *Roseth*, the circuit court properly awarded attorney fees because it implicitly found that International acted vexatiously. However, there is no express finding by the trial court of vexatiousness within the meaning of section 155

of the Illinois Insurance Code (215 ILCS 5/155 (West 1992)). Further, we find no basis upon which to presume such an implicit finding by the trial court, particularly in view of the fact that the appellees did not even raise the possibility of vexatious conduct in their pleadings or in their contentions to the trial judge. Accordingly, we reverse the award by the trial court of attorney fees in the amount of $304,890.82 for Keck's services in this coverage litigation.

## DISQUALIFICATION

International finally contends that the circuit court abused its discretion by holding that International waived any right to compel disqualification of Keck, Mahin & Cate as Chicago Heights' counsel in this coverage litigation. International maintains that an impermissible conflict of interest arose from Keck's simultaneous representation of eight International insureds in unrelated professional liability actions at the same time it represented Chicago Heights in this coverage litigation. International "does not complain [in] this appeal" of any possible conflict of interest arising from the former representation provided by Keck attorneys who represented it when affiliated with the law firm of Karon, Savikas & Horn.

International avers that the simultaneous representation violated Rule 5—105 of the Code of Professional Responsibility (107 Ill. 2d R. 5—105) which was then in effect. Rule 5—105 and its current counterpart, Rule 1.7 of the Rules of Professional Conduct (134 Ill. 2d R. 1.7), prohibit attorneys from representing a client with interests adverse to a current or former client absent the current or former client's assent.

Attorney disqualification is a drastic measure which courts should employ only as a last resort because disqualification motions can be misused for the purpose of harassment. (*SK Handtool Corp. v. Dresser Industries, Inc.* (1993), 246 Ill. App. 3d 979, 989, 619 N.E.2d 1282, 1289; *Hannan v. Watt* (1986), 147 Ill. App. 3d 456, 461-62, 497 N.E.2d 1307, 1311.) A trial court's decision whether to disqualify counsel, however, will not be disturbed absent a showing that it abused its discretion. (*SK Handtool*, 246 Ill. App. 3d at 986, 619 N.E.2d at 1286; *La Salle National Bank v. Triumvera Homeowners Association* (1982), 109 Ill. App. 3d 654, 665, 440 N.E.2d 1073, 1080.) Moreover, reviewing courts will not disturb a trial court's factual finding unless the record lacks any support for it. *Spencer v. Riordan* (1992), 240 Ill. App. 3d 938, 944, 608 N.E.2d 432, 437; *Skokie Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.* (1983), 116 Ill. App. 3d 1043, 1054, 452 N.E.2d 804, 812.

A party waives any objection to an alleged attorney conflict of

interest if it fails to assert that conflict promptly. *First National Bank v. St. Charles National Bank* (1987), 152 Ill. App. 3d 923, 932-33, 504 N.E.2d 1257, 1264 (holding that a party waived an attorney conflict by delaying 16 months before asserting it); *Tanner v. Board of Trustees of the University of Illinois* (1984), 121 Ill. App. 3d 139, 146-47, 459 N.E.2d 324, 329 (holding that a party waived an attorney conflict by delaying nine months before asserting it); *Roth v. Roth* (1980), 84 Ill. App. 3d 240, 244-45, 405 N.E.2d 851, 855 (holding that a party waived an attorney conflict by delaying two years before asserting it).

While there is a question whether appointing an attorney for an insured creates an attorney-client relationship between the insurer and the appointed counsel (compare *Nandorf, Inc. v. CNA Insurance Cos.* (1985), 134 Ill. App. 3d 134, 137, 479 N.E.2d 988, 991, with *Allstate Insurance Co. v. Keller* (1958), 17 Ill. App. 2d 44, 53, 148 N.E.2d 482, 486; see also *Atlanta International Insurance Co. v. Bell* (1989), 181 Mich. App. 272, 274-75, 448 N.W.2d 804, 804-05), we need not resolve that question.

■ Even assuming that an attorney-client relationship existed between Keck and International because of International's appointment of Keck to represent International insureds in eight professional liability actions, we have no reason to reverse the finding of the trial judge that International waived any right to compel Keck's disqualification. There is an ample basis upon which to support the trial judge's inference that such waiver occurred. This includes the facts, previously noted, that International was alerted to Keck's absorption of the Karon attorneys more than 16 months before it raised that ground as a basis for disqualification; that it was aware of Keck's representation of Chicago Heights in the underlying lawsuits for more than four years prior to its motion to disqualify; and that it was aware of Keck's representation of Chicago Heights in this declaratory judgment action for more than one year prior to its motion to disqualify. There is also a basis to infer that International acquiesced to the sufficiency of Keck's internal screening procedures.

International cites *Ransburg Corp. v. Champion Spark Plug Co.* (N.D. Ill. 1986), 648 F. Supp. 1040, and *International Business Machines Corp. v. Levin* (3d Cir. 1978), 579 F.2d 271, in support of its argument that the right to compel disqualification because of simultaneous representation is unwaivable. The district court in *Ransburg*, however, never held that conflicts of interest based on simultaneous representation are unwaivable; it merely found that under the circumstances of that case the client never consented to the conflicting representation. (See *Ransburg*, 648 F. Supp. at 1045-47.) In

*Levin,* moreover, the Third Circuit's decision clearly was not predicated on the ineffectiveness of waiver but rather on the failure to make an adequate disclosure of the simultaneous representation. See *Levin,* 579 F.2d at 280-82.

Where disclosure of an attorney conflict of interest is sufficient, no reason exists suggesting the inapplicability of the waiver doctrine. Additionally, the appellant has cited no precedent precluding the application of waiver to attorney conflicts of interest, whether based on simultaneous representation or otherwise. (*Cf. Ransburg,* 648 F. Supp. at 1045-47; *Levin,* 579 F.2d at 280-82.) Accordingly, we cannot say that the trial court abused its discretion in finding that International knew or should have known of a potential conflict more than a year before filing its motion to disqualify, resulting in International's waiver of any right it may have had to disqualify Keck, Mahin & Cate. See *Spencer,* 240 Ill. App. 3d at 944, 608 N.E.2d at 437; *Skokie Gold Standard Liquors,* 116 Ill. App. 3d at 1054, 452 N.E.2d at 812.

## CONCLUSION

For the reasons discussed above, the circuit court's grant of summary judgment in favor of Chicago Heights is reversed with respect to the award of attorney fees incurred by Chicago Heights in the *Gutierrez* litigation, in the sum of $1,484.88, and with respect to the amount awarded to Chicago Heights for attorney fees incurred in this coverage litigation, in the sum of $304,890.52. The circuit court's award in favor of Chicago Heights is affirmed with respect to the remainder of the judgment in the net amount of $572,082.31.

Affirmed in part and reversed in part.

McNULTY and COUSINS, JJ., concur.