48 F.3d 234
 HUDSON INSURANCE COMPANY, a Delaware corporation, and Safety
National Casualty Corporation, a Missouri
corporation, Plaintiffs-Appellees,
v.
CITY OF CHICAGO HEIGHTS, an Illinois municipal corporation,
Defendant-Appellant.
 No. 94-2697.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 7, 1994.
Decided Feb. 10, 1995.
 
 David C. Roston (argued), John W. Morrison, Daniel H. Fogel, Altheimer & Gray, Chicago, IL, for Hudson Ins. Co.
 James K. Horstman (argued), David E. Neumeister, Williams & Montgomery, Chicago, IL, for Safety Nat. Cas. Corp.
 James J. Casey, Kai A. Nebel, Kathleen M. O'Laughlin (argued), Steven E. Cyranoski, Keck, Mahin & Cate, Chicago, IL, for City of Chicago Heights.
 Before REAVLEY,* FLAUM, and KANNE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Safety National Casualty Corporation and Hudson Insurance Company brought a diversity suit against the City of Chicago Heights seeking a declaration of non-coverage for losses suffered by Chicago Heights as a result of a settlement in an underlying civil-rights discrimination case. The district court granted Hudson and Safety's joint motion for summary judgment, and we now affirm.
 
 I.
 
 2
 Donald Crotty and Donald Schak owned a number of buildings in Chicago Heights. In 1984, Crotty and Schak entered into contracts to sell the properties for $1.9 million. In August and September of 1984, however, Chicago Heights posted notices of approximately 4,300 building, health and fire code violations, and on September 27, 1984, the city ordered the buildings' tenants, most of whom were black, to vacate the premises. After the tenants left, the buildings' condition deteriorated because of fire damage, vandalism, looting, and other events. Chicago Heights ordered the buildings razed in November, 1984, and the properties were later demolished.
 
 
 3
 The building owners filed suit in federal court on May 14, 1986. Crotty v. City of Chicago Heights, 86 C 3412.[1] The building owners alleged that Chicago Heights had violated the owners' rights under 42 U.S.C. Secs. 1981 (intentional racial discrimination depriving a person of the right to make or enforce contracts), 1982 (intentional racial discrimination depriving a person of the right to purchase, lease, sell, hold, or convey property), 1983 (intentional violation under color of state law of a person's rights), 1985(3) (conspiracy depriving a person of the equal protection of the laws or the equal privileges and immunities under the laws), had tortiously interfered with their contracts, and had fraudulently conspired against the building owners.[2] Underlying all the Crotty claims was the owners' assertion that Chicago Heights had intentionally and discriminatorily posted building violations in order to destroy the buildings and drive out the mostly black residents.
 
 
 4
 A bifurcated jury trial of the Crotty claims began in June, 1992. The jury returned a verdict in the liability phase of the trial for the plaintiffs on all counts. Before the damages phase began, however, the parties entered into a settlement agreement. In the settlement, Chicago Heights expressly denied liability but agreed to pay the plaintiffs $4.5 million. The district court subsequently dismissed the law suit and no final judgment was entered.
 
 
 5
 Having incurred approximately $1.7 million in legal fees and costs in defending the Crotty suit in addition to the $4.5 million settlement, Chicago Heights sought reimbursement from its insurers. Chicago Heights had a comprehensive general liability policy with the Insurance Corporation of Ireland ("ICI") issued for the period from July 1, 1984, to July 1, 1985. The ICI policy included a duty to defend as well as liability limits of $500,000 for each occurrence under the policy and $500,000 in the aggregate. ICI appointed counsel to defend Chicago Heights in the Crotty case and contributed $350,000 to the settlement.
 
 
 6
 Chicago Heights also had a Public Employees and Public Liability Insurance Policy from International Insurance Company from May 1, 1984, to May 1, 1987. The International policy had limits of $1 million per loss and $1 million in the aggregate. International denied that its policy covered the settlement and refused to indemnify Chicago Heights at all.[3]
 
 
 7
 Finally, Chicago Heights had excess insurance coverage policies with Safety National Casualty Company and Hudson Insurance Company. The Safety policy provided umbrella coverage to Chicago Heights, its officers, employees, and other "Insureds" from July 1, 1984, through July 1, 1986, for $1 million per occurrence and in the aggregate. The Safety policy only obligated Safety to pay for an "ultimate net loss" in excess of the retained limit which Chicago Heights became legally obligated to pay as damages on account of personal injury, property damage or advertising injury liability caused by an "occurrence." The Hudson policy provided umbrella coverage to Chicago Heights on terms similar to the Safety policy, except that the Hudson policy was in excess of the Safety policy and had a limit of $4 million in the aggregate. Hudson's coverage extended from July 1, 1984, to July 1, 1985.
 
 
 8
 Safety, a Delaware corporation with its principal place of business in New York, and Hudson, a Missouri corporation with its principal place of business in Missouri, jointly filed this diversity action against Chicago Heights seeking a declaration of non-coverage for the losses Chicago Heights incurred in the Crotty settlement. Chicago Heights filed a counterclaim against Safety and Hudson, as well as a complaint against International. All parties moved for summary judgment. The district court granted Safety and Hudson's motion on the ground that the events leading to the Crotty settlement did not constitute an "occurrence" as defined in the Safety and Hudson policies but declined to rule on the insurance companies' other theories. Chicago Heights now appeals that decision.
 
 II.
 
 9
 Chicago Heights maintains on appeal that the district court erred in finding there was no occurrence under the Safety and Hudson policies. Chicago Heights contends that the district court improperly gave preclusive effect to the Crotty jury verdict because that verdict was never entered. Furthermore, Chicago Heights argues, even assuming that the verdict is preclusive, no ultimate facts derivable from that verdict necessarily establish that the city intended the destruction of any buildings. We agree with the district court that there was no "occurrence" under the policy and affirm on that ground.[4]
 
 
 10
 We review a district court's grant of summary judgment de novo. Karanzanos v. Navistar Intern. Transp. Corp., 948 F.2d 332, 334 (7th Cir.1991). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists. Once that burden is met, the non-moving party must come forward with specific facts to rebut that showing. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). We review the record, and all reasonable inferences which can be drawn from it, in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986).
 
 
 11
 In the instant case, the Safety policy required Safety to pay for:
 
 
 12
 ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages because of
 
 
 13
 a. personal injury or
 
 
 14
 b. property damage or
 
 
 15
 c. advertising injury
 
 
 16
 to which this insurance applies, caused by an occurrence....
 
 
 17
 The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the Insured." The Hudson policy was a "following-form" excess policy such that any liability on the part of Hudson was premised on liability on the part of Safety. Therefore, neither policy is activated unless there was an "occurrence" under the Safety policy.
 
 
 18
 The parties agree that Illinois law controls the interpretation of the insurance contracts at issue in this case. Under Illinois law, "civil rights claims for intentional violations can fall under the definition of occurrence as long as the injuries incurred were not specifically intended or expected." Argento v. Village of Melrose Park, 838 F.2d 1483, 1498 (7th Cir.1988); see also Calvert Ins. Co. v. Western Ins. Co., 874 F.2d 396, 399 (7th Cir.1989) ("The focus at all times, under Illinois law, is whether the injury was expected or intended by the police officers, not whether the acts of the officers were performed intentionally.") (emphasis in original); USF & G v. Wilkin Insulation Co., 144 Ill.2d 64, 161 Ill.Dec. 280, 286, 578 N.E.2d 926, 932 (1991); Illinois Farmers Ins. v. Preston, 153 Ill.App.3d 644, 106 Ill.Dec. 552, 554-55, 505 N.E.2d 1343, 1345-46 (1st Dist.1983). "Expected" injuries include those that "are of such a nature that they should have been reasonably anticipated by the insured." Bay State Ins. Co. v. Wilson, 96 Ill.2d 487, 71 Ill.Dec. 724, 726, 451 N.E.2d 880, 882 (1983). In Argento, for example, the black victim of a police beating prevailed under 42 U.S.C. Sec. 1985(3) on a claim charging his assailants with discriminatorily conspiring "to deprive him of justice and equal protection of the laws." 838 F.2d at 1486. We held that the police department's insurer could not, on a summary judgment motion, deny coverage to one of the officers on the basis of an "occurrence" clause because the infliction of bodily injury was not a necessary element of a Sec. 1985(3) claim and neither side had presented uncontroverted evidence as to whether that officer, who had not been present at the beating, had specifically intended the injury. Id. at 1498-99. Using similar reasoning, we concluded in Calvert, another police assault case, that there was no occurrence under an insurance contract, and therefore no coverage, because the Calvert officers clearly expected to harm their victim. 874 F.2d at 399. We likewise determined in Calvert that the city employing the officers lacked coverage under the same policy. We held that the city had "expected" the suspect's injuries because it had "recklessly" failed to supervise the officers. Id. at 399-400.
 
 
 19
 As a first step, we must ascertain the relevance of the Crotty case and its subsequent settlement. Chicago Heights contends that the jury verdict in Crotty is a nullity and should have no binding effect. We disagree. Illinois law dictates, for example, that "when a plaintiff dies after having received a verdict in his favor but before the entry of judgment, his action does not abate and he is entitled to judgment upon that verdict." Tunnell v. Edwardsville Intelligencer, 43 Ill.2d 239, 252 N.E.2d 538, 540 (1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1259, 25 L.Ed.2d 530 (1970). Moreover, a jury verdict need not be final to have collateral estoppel effect. See, e.g., Davenport v. DeRobertis, 844 F.2d 1310, 1313-14 (7th Cir.), cert. denied sub nom. Lane v. Davenport, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); RESTATEMENT (SECOND) JUDGMENTS Sec. 13g & comment 3 (1980). The settlement disputed in this case arose from the jury verdict; it was designed to settle the very claims submitted to the jury. Logic counsels that those claims, and whatever ultimate facts would be necessary to prove them, should determine what the settlement settled. Cf. St. Paul Fire and Marine Ins. Co. v. Nat'l Chiropractic Mut. Ins. Co., 496 N.W.2d 411, 415 (Minn.Ct.App.1993). As Safety and Hudson point out, it was precisely because the Crotty jury had found the liability issues against Chicago Heights that Chicago Heights settled the case.
 
 
 20
 The Crotty case and settlement demonstrated that Chicago Heights intentionally and discriminatorily posted the buildings at issue in order to drive out the buildings' black residents. As Argento cautions, the consequences of intentional actions are not necessarily intended or expected. It is nonetheless reasonable to infer from the ultimate facts of the Crotty case that Chicago Heights, as a result of its actions, expected to destroy the buildings and interfere with the building owners' contracts. One might not expect that intentional discrimination or tortious interference with contractual relations, as abstract claims, would lead to the destruction of buildings, but they certainly do under the given circumstances. Furthermore, when Safety and Hudson came forward with evidence supporting that inference, Chicago Heights presented nothing in response except for its denial of liability in the settlement. We are therefore left with the essentially undisputed conclusion that even if Chicago Heights did not intend the destruction of the buildings through vandalism by third parties, it should have expected the destruction of the buildings and the ultimate damages suffered by the Crotty plaintiffs as the likely consequence of that action. That is enough for summary judgment.
 
 
 21
 Thus, we hold that there was no occurrence under the Safety policy or the Hudson policy that triggered either company's coverage obligations. For the foregoing reasons, the decision of the district court is affirmed.
 
 
 22
 AFFIRMED.
 
 
 
 *
 The Honorable Thomas M. Reavley, of the United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 Another, almost identical, suit had been proceeding in state court since 1985. The building owners subsequently dismissed this suit voluntarily and elected to proceed on the federal action alone
 
 
 [2]
 Other counts were initially pleaded but subsequently dismissed voluntarily
 
 
 [3]
 A coverage dispute action between International and Chicago Heights is currently pending in the federal district court, although an Illinois state appellate court recently determined in a separate declaratory judgment action that International's policy permitted recovery of approximately $573,600 for a portion of the legal fees arising from the Crotty suit. International Ins. Co. v. City of Chicago Heights, 268 Ill.App.3d 289, 205 Ill.Dec. 698, 643 N.E.2d 1305 (1994)
 
 
 [4]
 Because we affirm on this ground, we, like the district court, do not address the alternative grounds on which Safety and Hudson sought summary judgment. These other arguments include the city's alleged failure to maintain $5 million in coverage underlying the Safety and Hudson policies, additional exclusion clauses in both policies that precluded coverage, and Chicago Heights' failure to apportion its settlement costs among intentional and unintentional theories of liability