2019 IL App (2d) 180988-U
No. 2-18-0988
Order filed November 5, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| RALPH PEREZ AND KRISTEN PEREZ, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiffs-Appellees/Cross-Appellants, | ) | |
| | ) | |
| v. | ) | No. 16-CH-728 |
| | ) | |
| CECILIA OCHOA, | ) | |
| | ) | |
| Defendant-Appellant/Cross-Appellee, | ) | Honorable |
| | ) | Paul M. Fullerton, |
| (Carlos Ochoa, Defendant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's judgment of accounting, which determined defendants' partnership buyout value to be $118,085.

¶ 2    Defendants, married couple Cecilia and Carlos Ochoa, dissociated from a partnership. The trial court conducted a hearing to value the partnership, account for debts and credits, and determine defendants' buyout price. Plaintiffs, married couple Kristen and Ralph Perez (Cecilia's brother), sought for the buyout price to account for Ralph's work on the partnership property, a six-unit apartment building, plus interest. Defendants argued that Ralph was not entitled to a

reimbursement, because section 401(h) of the Uniform Partnership Act (Act) (805 ILCS 206 ILCS 206/401(h) (West 2016)) precluded remuneration to partners for services performed on behalf of the partnership, absent an agreement.

¶ 3     The trial court agreed with plaintiffs, reimbursing Ralph for his work, but it did not award interest. It did not specify whether it considered the work performed to fall under section 401(h). Rather, it found that, independent of section 401(h), the partnership *had* agreed to pay Ralph. Also, the trial court accounted for Cecilia's failure to pay rent for a number of years. The court noted, however, that the parties had conducted the partnership in an informal manner and kept poor records, which had made its accounting and valuation tasks more difficult.

¶ 4     Cecilia appeals,[1] arguing that the trial court erred in reimbursing Ralph and in allowing evidence on the issue of reimbursement. She also argues that, as a partner, she had not been required to pay rent when living in a building owned by the partnership. We reject these arguments.

¶ 5     Plaintiffs cross-appeal, arguing that the trial court should have awarded interest on a portion of the reimbursement award. We reject their argument. Given the poor records kept by

---

[1] Only Cecilia appeals, not Carlos. Plaintiffs argue this means that, even if Cecilia were successful on appeal, she would only be entitled to one half of any correction of the award. Given that we ultimately reject Cecilia's arguments, we need not address this point. In any case, the trial court made the following clarification in a footnote of its order: "Defendant, Carlos Ochoa, married to co-defendant Cecilia Ochoa, did not participate in this trial. While each of the parties own 25% of the partnership, because both the plaintiffs and the defendants are married couples, and the parties have agreed[,] the division of assets shall be on a 50/50 basis."

all parties, including Kristen and Ralph, we determine that the trial court fashioned as fair of an award that could be supported by the evidence. We affirm.

¶ 6                                    I. BACKGROUND

¶ 7     In May 2016, plaintiffs filed a complaint against defendants, alleging breach of fiduciary duty, seeking defendants' dissociation from the partnership and, in the alternative, a dissolution and accounting of the partnership. Plaintiffs' theory was that, over the decades, defendants, specifically Cecilia, did not contribute to the costs of repairs. As Cecilia would ultimately admit at trial, Cecilia turned over only enough rent proceeds from "her" three units to cover her share of the mortgage, taxes, and utilities. She kept the remainder. As a result, plaintiffs used the money they collected from "their" three units to cover all repair costs, averaging $5000 per year, and reducing their profits.

¶ 8     In October 2016, defendants agreed to dissociate from the partnership. Rather than go to trial on the remaining counts, the parties stipulated to the following:

> "1. The parties agree to a dissociation of the partnership and that the partnership shall be terminated upon the earlier of the payment to the defendants of their court ordered 50% share value or the sale of the property.

> 2. That plaintiff[s] shall be allowed to retain ownership of the property upon payment to defendants for their court ordered 50% share value and release of the existing mortgage.

> 3. That, in the event that plaintiff[s] [do] not buy out defendants' 50% share, the property shall be sold upon terms determined by the court.

4. That Cecilia Ochoa shall vacate the property within 30 days of the payment of defendants' court ordered share and release of the existing loan and the court shall retain jurisdiction to enter an order of possession.

5. That a partnership exists and Ralph Perez, Kristen Perez, Carlos Ochoa, and Cecilia Ochoa are each 25% owners.

6. That the fair market value of the property is $450,000."

¶ 9    Two pretrial matters are of note. First, the parties entered an additional stipulation that revenue and expenses should be treated as a whole and not attributed to individual units in the property. Second, Cecilia moved *in limine* to bar evidence relating to payment for Ralph's services, purportedly performed under section 401(h). The trial court denied the motion, explaining that it would consider the evidence of the work performed and whether payment for that work was barred under section 401(h).

¶ 10    The case proceeded to trial to determine the buyout value of defendants' partnership interest, after accounting for debts and credits. With discrepancies noted, the parties testified as set forth below. (Carlos had moved out of the country, and he did not testify.)

¶ 11    Married couple Kristen and Ralph and married couple Cecilia and Carlos each own a 50% share of the partnership. There is no written partnership agreement. The partnership's sole asset is a six-unit apartment building. Originally, decades ago, the building was owned by Ralph and Cecilia's parents. The parents divorced sometime prior to 1988, and the mother was awarded the building. The mother needed help maintaining and managing the building as a commercial enterprise. The mother sought the help of Cecilia and Carlos. In exchange for their help, the mother gave them a 50% partnership interest. In 1988, the mother passed away. Her estate divided her remaining 50% interest among three of her other children, Ralph, Raul, and Vickie. Thus,

Cecilia maintained her one-half share, and the other siblings each gained a one-sixth share. Cecilia managed the building, in that she collected the rents and paid the utilities and the mortgage.

¶ 12    According to Ralph, beginning around 1990, the partnership agreed that he would be responsible for all repair and maintenance issues for the building. He had the resources and was well-suited to the task, because he worked in the trades.

¶ 13    In 1998, Ralph bought out Raul's one-sixth interest. Raul had other responsibilities and no longer wanted to be involved in the partnership. Ralph, Raul, Cecilia, and Vickie were all present at the partnership meeting when the buyout was discussed. Ralph, Raul, and Cecilia each testified that the meeting occurred. Ralph and Raul each testified that the partnership agreed that Ralph would be reimbursed for work performed prior to 1998 in the form of a discounted price for Raul's one-sixth share. This meant that five-sixths of the amount due to Ralph for his work to that point remained due. Ralph explained:

> "Q. *** [W]hat was discussed at that meeting?
>
> A. The amount of money [Raul] was to receive for the buyout and the amount of work I had done to that point.
>
> Q. So did you reach an agreement with your brother about the amount of the buyout for his one-sixth share?
>
> A. Yes, it was $15,000.
>
>                                   * * *
>
> Q. Was an agreement reached regarding the amount of the credit you would get for the work you had done so far until 1998?
>
> A. Yes.
>
> Q. What was the amount agreed to?

A. $5000.

* * *

Q. So, if my math is correct, the work that you calculated up until that point was approximately $30,000?

A. Right.

Q. [Raul's] one-sixth share was $5000?

A. Yes."

¶ 14    To pay Raul, the partnership refinanced the property.  It immediately paid Raul $10,000, representing his $15,000 buyout minus his $5000 share of payment to Ralph.  Then, over six years, Ralph took responsibility for the $10,000 paid to Raul by paying $200 per month over his share of the mortgage.

¶ 15    Cecilia disagreed with Ralph and Raul's testimony in part.  Although she testified that the buyout price accounted for work performed by Ralph, she believed that the buyout discount was to account for work to be performed in the future, not work that had already been performed.

¶ 16    In 2002, Ralph bought Vickie's one-sixth interest in the partnership.  A meeting amongst remaining partners occurred.  The 2002 meeting was similar to the 1998 meeting.  Cecilia was present.  Ralph bought out Vickie's one-sixth interest, less her one-sixth share of payment to Ralph for work performed prior to 2002.  To pay Vickie for her one-sixth interest, the partnership again refinanced and, then, Ralph paid back the partnership by paying more than his share of the mortgage for a period.

¶ 17    Ralph asserted that, at the 2002 buyout, the parties agreed that he was entitled to $60,000 for repairs.  Cecilia did not disagree with the amount.  Rather, she again asserted that the buyout arrangement concerned future repair work.

¶ 18    From 2002 forward, Ralph and Cecilia each held a 50% share. Each chose to further divide his or her own share with their respective spouses. Nevertheless, because the parties on both sides are married couples, the court's task would be to determine each couple's 50% share.

¶ 19    Sometime after 2002, Ralph's wife, Kristen, took over the management of the building. She collected rent directly from the three units that had been (unofficially) allocated to her and Ralph. She allowed Cecilia to collect rent directly from the three units that had been allocated to Cecilia and Carlos. However, Cecilia did not, in turn, submit the total rent from those units to go toward the property's maintenance prior to the distribution of profits. Rather, Cecilia only submitted enough to cover her share of the mortgage, taxes, and utilities. Beginning in October 2014, Cecilia allowed Kristen to collect rent directly from all six units.

¶ 20    Also from 2002 to present, Ralph continued to perform all repairs and maintenance. (Ralph testified that, occasionally, other family members would help. These were not significant projects. Their contribution usually warranted a small payment or pack of beer.)

¶ 21    In 2010, Ralph started his own corporation, Cornerstone Building Services. Cornerstone performed work on the building from that point on, but the partnership did not pay it (aside from one or two work orders). Cornerstone performed work in nearly all the trades, including electrical work, plumbing, painting, tile, drywall, and light maintenance issues. Cornerstone hired workers and contractors to perform some of its work.

¶ 22    Ralph described work performed over the years. He replaced the following: doors and windows, the property's fence, all decks (twice), drywall (several times), circuit breakers, hot water tanks, gutters, flashings, the flooring in all units, kitchen appliances in all units, and cabinets in three units. He painted hallways and basements, removed flood-damaged property, installed conduit, performed two major roof repairs, and repaired cracked concrete under the substrate.

Much of this work had been required by the municipality following inspections. Based on his years of experience in the trade industry, the prices reflected in the work orders were fair and reasonable. He charged below-market rates for plumbing and electrical work.

¶ 23    In addition to the agreed upon $60,000 for repairs prior to 2002, Ralph averred that he performed $65,085 in repairs from 2002 to 2017. This is an average of $4339 per year in repairs. Ralph did not keep strict records. Rather, in preparation for trial, he recalled the work that he performed by walking through the building, taking notes, and looking back at old inspection reports. However, for the period from 2014 to 2017, Ralph retained the contemporaneously prepared work orders. These work orders accounted for $29,742.50 of the total alleged $65,085.

¶ 24    Cecilia admitted in her testimony that, although she lived in one of the units from November 2015 through the trial in October 2018, she did not pay rent to the partnership. She explained that her obligation to pay rent hinged on the profitability of the partnership:

> "Q. Okay, so as long as—so your testimony is, as long as there was a negative cash flow, you were required to pay rent. But if there was a positive cash flow, you don't have to pay rent anymore?
>
> A. That's correct."

Cecilia lived in a unit in the building with her father, who had signed a monthly $700 lease. Her father initially lived with Raul. Her father paid one-half the total amount due, and Raul paid the other half. When Raul moved out and Cecilia moved in, her father paid one-half the total amount due, and Cecilia paid nothing.

¶ 25    Cecilia also admitted that, when she procured re-financing for the building years prior, she forged a tenant's signature to prove to the bank that the building was occupied. That tenant, Daniel Hurtado, did live in the building. Cecilia claimed that Kristen told her to commit the forgery.

Kristen denied this. Rather, Kristen testified that, when going through the mortgage paperwork, she saw a document purportedly signed by Hurtado. Hurtado had lived in the building for decades, and she recognized his signature. This did not look like his signature. So, she reached out to Hurtado to ask him if he had signed the document. He said no. Hurtado testified, confirming that the signature in question was not his.

¶ 26   At the close of evidence, the trial court asked the parties to present their closing argument in written form. The parties agreed that the court would begin with a building valuation of $450,000, and determine defendants' buyout price from there. Cecilia conceded that her buyout price would be less than one-half of $450,000, because certain uncontested items, such as remaining mortgage debt, had to be accounted for. She did not believe, however, that Ralph should be reimbursed for the work that he performed on the building, because section 401(h) of the Act did not allow a partner to be compensated for his service to the partnership. Section 401(h), and other relevant provisions in section 401 of the Act, state:

> "401. Partner's rights and duties.

> * * *

> (c) A partnership shall reimburse a partner for payments made and indemnify a partner for liabilities incurred by the partner in the ordinary course of the business of the partnership or for the preservation of its business or property.

> (d) A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.

> (e) A payment or advance made by a partner which gives rise to a partnership obligation under subsection (c) or (d) of this Section constitutes a loan to the partnership which accrues interest from the date of the payment or advance.

* * *

　　　(g) A partner may use or possess partnership property only on behalf of the partnership.

　　　(h) A partner is not entitled to remuneration for services performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership."  805 ILCS 206/401 (West 2016).

¶ 27　　Cecilia also argued that Ralph breached his fiduciary duty to the partnership by engaging in self-dealing in hiring himself and/or Cornerstone to perform the repairs.  She asserted that he charged inflated prices.

¶ 28　　Ralph disagreed that section 401(h) (remuneration for services to partnership) applied.  He believed his services more likely fell under section 401(c) (reimbursement of liabilities incurred for the preservation of the partnership property) or 401(d) (reimbursement for capital contributions).  Ralph further urged the court to disregard Cecilia's breach-of-fiduciary-duty argument.  Ralph contended that Cecilia had forfeited the opportunity to claim a breach of fiduciary duty, because she did not raise an affirmative defense or file a counterclaim.  He requested reimbursement as set forth above, with interest.  Also, Ralph requested payment for his work on the partnership property, with interest.

¶ 29　　The trial court prefaced its order as follows:

　　　"The parties had no written partnership agreement.  The partnership bookkeeping and accounting of rents, expenses, profits and liabilities lacked any formal regularity and accuracy.  Many documents were admitted into evidence at trial, but the accuracy and completeness of these documents was also lacking, creating issues of reliability for the court."

¶ 30　Still, the court largely ruled in favor of plaintiffs. The court did not specify whether it considered the work performed to fall under section 401(h). Rather, it found that, independent of section 401(h), the partnership had *agreed* to pay Ralph. The court credited Ralph for his work in the amount of $89,742.50. The first $60,000 represented the agreed upon value of Ralph's work prior to 2002, as determined at the 1998 and 2002 buyout meetings of Raul and Vickie. The remaining $29,742.50 represented work performed between 2014 and 2017, as set forth in Ralph's contemporaneously prepared work orders. The court did not credit Ralph for work performed between 2002 and 2014, because Ralph's records were not sufficient. It did not award interest.

¶ 31　The court also accounted for years in which Cecilia lived in the building but did not pay rent, totaling $9750 from 2015 to 2018.

¶ 32　Finally, the court accounted for numerous other items not challenged on appeal. These now uncontested items included: rent collected, reimbursements to third parties for repair supplies, a $9026 tax refund that had been improperly retained by Cecilia instead of being used for the partnership, and the outstanding mortgage, taxes, insurance, utilities. In light of Ralph's work credit, Cecilia's past-due rent, and the now uncontested items, the court determined Cecilia's buyout price to be $118,085. This appeal followed.

¶ 33　　　　　　　　　　　　　　II. ANALYSIS

¶ 34　Cecilia appeals, arguing that the trial court erred by: (1) crediting Ralph for work performed when section 401(h) of the Act prohibits remuneration to a partner for his or her services to a partnership; (2) crediting Ralph for work performed when Ralph breached his fiduciary duty; (3) denying her motion *in limine* and considering evidence of the value of Ralph's work; and (4) finding that Cecilia owed rent to the partnership for the three-year period that she lived in the

partnership property.  Plaintiffs cross-appeal, arguing that, because Ralph's work fell under section 401(c) or 401(d) of the Act, he was entitled to interest.

¶ 35    These issues turn on questions of fact, such as the nature of Ralph's work, whether the partnership agreed to reimburse Ralph, and whether Cecilia owed past-due rent.  We will reverse a trial court's judgment on questions of fact only if it is against the manifest weight of the evidence, meaning the opposite result is clearly evident.  *Kirk Patrick v. Strosberg*, 385 Ill. App. 3d 119, 129 (2008).  We are also mindful that the trial court, as the trier of fact, is charged with ascertaining the credibility of the witnesses and resolving inconsistencies in their testimony.  *Anderson v. City of Chicago*, 29 Ill. App. 3d 971, 974-75 (1975).  The trial court may also draw reasonable inferences from the evidence.  *Poulakis v. Taylor Rental Car Center, Inc.*, 209 Ill. App. 3d 378, 383 (1991).

¶ 36    Before we consider the parties' arguments, we address the parties' failure to adhere to traditional business practices and its poor record-keeping over the decades.  Like the trial court, this makes our review difficult.  Unlike the trial court, we have not had the benefit of observing witness testimony so as to assess credibility.  The lack of reliable record-keeping makes our deference to the trial court's credibility determinations all the more important.

¶ 37    The parties' poor record-keeping put the trial court in a position to consider the equities in fashioning a buyout price that could be supported by existing evidence.  Trial courts may fashion an equitable decree when determining each partner's award following the dissolution of a partnership in certain circumstances, such as when the partners kept poor or unconventional accounting records, so long as there is still sufficient evidence to support the award.  *Couri v. Couri*, 95 Ill. 2d 95, 99 (1983).

¶ 38    In *Couri*, a case involving a grocery store run by two brothers in partnership, the trial court ordered the managing partner to provide records. The records were unconventional, incomplete, and partially destroyed. Based on the records turned over by the managing partner, the reported income was approximately $450,000. The other partner, who had not been in charge of managing the records, put forth an estimate of $1 million. Based on certain admissions in the record, the trial court determined that the actual income had been approximately $750,000, and it used that figure in its decree.

¶ 39    The supreme court approved of the trial court's estimation, explaining:

> "Despite the imprecise nature of some of plaintiff's proof, there was sufficient evidence from which the trial court could fashion an equitable decree, and we do not believe, as the appellate court apparently did, that in these circumstances the trial court was required to detail the nature or method of its calculations. Thus, unlike the case relied upon by the appellate court (*Fineman v. Goldberg*, 329 Ill. 507 (1928)), the evidence here, although voluminous, is not in such a state of uncertainty that it is impossible to determine whether any amount is due." *Id*. at 99.

¶ 40    The *Couri* court considered that, although the non-managing plaintiff carried the burden of proof, the managing defendant had had a fiduciary duty to the partnership to keep proper records. *Id*. Therefore, the equities permitted the trial court to forgo a detailed calculation. *Id*.

¶ 41    Here, the court faced different equitable considerations. For the majority of the time in question, Kristen kept the partnership's records and it was within Ralph's power to submit proper work orders. Indeed, the trial court did not award plaintiffs the total amount requested, due in part to their poor record-keeping. However, neither did the court believe it fair to award plaintiffs nothing, when they clearly expended significant capital on necessary repairs, and Cecilia did not

contribute to any of the repairs. Many of the repairs were required by the municipal inspector, and Cecilia does not now point to any repair as unnecessary. The lack of precise records on plaintiffs' part did not preclude the court from determining that some amount was due to them or from fashioning an award corresponding to the existing evidence.

¶ 42                                    A. Cecilia: Section 401(h)

¶ 43    We now turn to Cecilia's specific arguments. Cecilia first argues that the trial court erred by crediting Ralph for work performed, when section 401(h) of the Act prohibits remuneration to a partner for his or her services to a partnership. Again, section 401(h) states: "A partner is not entitled to remuneration for services performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership." 805 ILCS 206/401(h) (West 2016). Under section 401(h), courts should not attempt to equalize compensation commensurate with services. *Couri*, 95 Ill. 2d at 102. Section 401(h) prohibitions apply only in the absence of an agreement to the contrary. *Id*. at 101 (quoting the statutory precursor to 805 ILCS 206/401(h) (West 2016), Ill. Rev. Stat. (1981), ch. 106 1/2, par. 18(f)).

¶ 44    The parties dispute whether the repairs at issue are covered by section 401(h). Cecilia appears to acknowledge that the entire $89,742.50 in credit does not fall under section 401(h), because some of that credit covered the cost of materials. She contends, however, that a remaining unspecified amount *is* covered under section 401(h). Plaintiffs, in contrast, contend that none of the $89,742.50 in credit falls under section 401(h), because section 401(h) covers running the day-to-day operations *of the partnership*, not maintenance and repair work *to the partnership property*. Plaintiffs note that they are *not* seeking compensation for their years performing the day-to-day management of the partnership itself, such as interacting with tenants, collecting rents, and paying bills. Plaintiffs cite several cases in anecdotal support of their position. See *Couri*, 95 Ill. 2d at

102 (remuneration sought was a salary for running the day-to-day operations of the grocery store); *Margonis v. Rossi*, 116 Ill. App. 2d 234 (1969) (physician sought salary for managing laboratory before dividing profits).

¶ 45    Ultimately, we need not decide whether any portion of the $89,742.50 in credit falls under section 401(h), because the evidence supports the trial court's determination that the partnership *agreed* to reimburse Ralph for his repair work.  Again, section 401(h) prohibitions apply only absent an agreement to the contrary.

¶ 46    The evidence supports the existence of an agreement.  Ralph, Raul, and Cecilia each testified that the partnership agreed that Ralph's 1998 and 2002 buyout prices would be offset by the value of repairs made.  Ralph and Raul testified that the repairs occurred *prior* to the buyouts. Cecilia testified that the buyout prices were offset by the cost of anticipated repairs, to occur *after* 2002.  Although Cecilia believes her testimony to weigh against establishing a $60,000 credit, it still shows her assent to Ralph being entitled to some credit for the value of repairs made.

¶ 47    Additionally, independent of the buyout meetings, the evidence supported that there was an agreement.  Ralph testified that he had an agreement with each of the then partners and later with only Cecilia, that he would perform contract and repair work for the building.  It would be more efficient for him to do the work, because he was in the trades.  He owned a business that performed work in nearly all trades, including electrical and plumbing.  He testified that he charged the partnership market value to below-market value for his work.  Thus, overall, the partnership incurred less cost for repairs than if it had hired a third party.  Ralph submitted a list of repairs performed.  Many of these repairs were significant, such as repairing roofs and concrete.  Many of these repairs were also required by the municipality following inspection.  The trial court was permitted to draw reasonable inferences from the evidence (*Poulakis*, 209 Ill. App. 3d at 383), and

it did not err in inferring that work of such an extensive and skilled nature would only have been undertaken with an agreement for reimbursement as was consistent with Ralph's testimony.

¶ 48    Further, Ralph's testimony was corroborated by Raul as to the buyout agreement. It is true that Cecilia's testimony was inconsistent with that of her brothers, but the trial court was free to resolve the inconsistency in Ralph's favor. *Anderson*, 29 Ill. App. 3d at 974-75. To be sure, Cecilia showed herself to be unreliable at several points during the trial. She admitted to forging a signature to procure a refinancing. Additionally, she retained a tax refund that was owed to the partnership. We also note that, contrary to Cecilia's position, she and Carlos *did* receive payment for their services to the partnership property before Ralph took over the maintenance role. Their early service to the building was the reason that Cecilia's mother gave them a 50% interest in the partnership.

¶ 49    We reject Cecilia's alternative argument that she only agreed to be responsible for repair costs associated with "her side" of the building and that, consequently, Ralph should not be reimbursed for work performed on "his side" of the building. The parties stipulated at the beginning of trial that revenue and expenses should be treated as a whole and not attributed to individual units in the property, because the appraiser determined that "one side" of the property was worth much more than the other. The work that Ralph performed on his side of the building enhanced the value of the entire building, which was to be split 50/50. In any event, Ralph testified that he performed work on *both* sides of the building, and on common areas, such as the roof.

¶ 50    In sum, we need not decide whether any portion of the $89,742 in repair work to the partnership property constituted a service to the partnership under section 401(h). Regardless of section 401(h) prohibitions, the partnership agreed to pay Ralph for his work. The trial court's finding in this regard was not against the manifest weight of the evidence.

¶ 51                                    B. Cecilia: Fiduciary Duty

¶ 52     Cecilia next argues that Ralph breached his fiduciary duty to the partnership by engaging in self-dealing and hiring himself and/or his business to perform repair work. Plaintiffs respond that, because Cecilia failed to plead any affirmative defense or counterclaim, such as breach of a fiduciary duty, she has forfeited the issue. Ralph raised this point below in his written closing argument. In its written order, the trial court did not address the fiduciary duty issue; rather, it echoed Ralph's closing argument in stating that "there were no affirmative defenses, counterclaims, or third-party claims." In her reply brief, Cecilia retreats and clarifies that she only raises the issue of fiduciary duty to demonstrate the unlikelihood that the partnership ever agreed to reimburse Ralph for his services. She states: "Cecilia Ochoa does not assert at this stage an affirmative defense [or counterclaim], but rather that the trial court erred insofar as it inferred a partnership remuneration agreement with terms that are at odds with statutory fiduciary duties."

¶ 53     With this retreat, Cecilia's breach-of-fiduciary-duty argument becomes merely a supplement to her factual claim that the partnership never agreed to reimburse Ralph. We have already determined that the evidence supports the existence of an agreement. Therefore, what is left of Cecilia's fiduciary argument fails.

¶ 54     In any event, the evidence does not support that Ralph breached his fiduciary duty. Each partner has a fiduciary duty to exercise good faith in all dealings with the partnership. *1515 North Wells L.P. v. 1512 North Wells, L.L.C.*, 392 Ill. App. 3d 863, 874 (2009). A partner cannot engage in self-dealing at the expense of the partnership to which he or she owes a duty. *Id.* To state a claim for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary duty on the part of the defendant; (2) the defendant's breach of that duty; and (3) damages that were proximately caused by the defendant's breach. *Id.*

¶ 55    Here, as we have discussed, the evidence supports the trial court's determination that the partnership *agreed* to hire and reimburse Ralph. Ralph testified that his charges ranged from low to fair. Ralph's assertion of fair pricing is supported by the fact that he was able to perform both major repairs and standard maintenance on a six-unit apartment building for an average cost of $5000 per year. There is no evidence that the repairs were unnecessary or that Ralph profited at the expense of the partnership. Cecilia does not point to evidence of damages. We will not further entertain this argument.

¶ 56                    C. Cecilia: Motion *In Limine*

¶ 57    Cecilia next argues that the trial court erred in denying her motion *in limine* to bar evidence of Ralph's repairs. The trial court's ruling on a motion *in limine* is reviewed for an abuse of discretion. *Swick v. Liataud*, 169 Ill. 2d 504, 521 (1996).

¶ 58    Specifically, Cecilia contends that the court should not have considered the evidence of Ralph's repairs, because section 401(h) prohibits a partner from receiving remuneration for services. Cecilia's argument hinges on a positive resolution for her on her section 401(h) argument. However, her section 401(h) argument was not successful. Therefore, this argument also fails. In any case, we cannot see why the trial court would have abused its discretion in choosing to hear the evidence prior to deciding whether section 401(h) precluded reimbursement. We need not address the parties' remaining points about the motion *in limine*.

¶ 59                    D. Cecilia: Past Due Rent

¶ 60    Cecilia argues that the trial court erred when it credited defendants in the amount of $9750, representing Cecilia's non-payment of rent from 2015 to 2018. Again, during that time, Cecilia lived in a unit in the building with her father, who had signed a lease years prior. Her father initially lived with Raul. Her father paid one-half of the total due, and Raul paid the other half.

When Raul moved out and Cecilia moved in, her father paid one-half of the total due, and Cecilia paid nothing. Cecilia acknowledges that, if she had been required to pay one-half of the unit's monthly rent during that period, the total rent owed would have been $9750. She contends, however, that: (1) as a partner, she was allowed to live in the building rent free; and (2) in any event, she never entered into an enforceable lease and, instead, was a guest in her father's unit.

¶ 61     First, a partner is not entitled to exclusive possession of partnership property while the partnership is ongoing. *Cook v. Lauten*, 335 Ill. App. 92, 97 (1948). A partner is not a co-owner of the partnership property. 805 ILCS 206/501 (West 2016). A partner may use or possess partnership property only on behalf of the partnership. 805 ILCS 206/401(g) (West 2016). Cecilia is confusing her partnership interest in the property with personal ownership of the property, which she does not have. Even Cecilia would have to admit that, had she not been living in the unit, her father would have been required to pay the full rent amount. The difference is money lost to the partnership.

¶ 62     Second, a party need not sign a lease to establish a tenancy; rather, tenancies may arise from an implied contract predicated upon the conduct of the parties. See *Moore v. Rueck*, 322 Ill. App. 73 (1944). The evidence supports that that occurred here. Cecilia herself virtually admitted that she was a tenant subject to an implied contract, because she testified that her obligation to pay rent hinged on the profitability of the partnership:

> "Q. Okay, so as long as—so your testimony is, as long as there was a negative cash flow, you were required to pay rent. But if there was a positive cash flow, you don't have to pay rent anymore?
>
> A. That's correct."

This was an improbable arrangement that the court reasonably rejected, but Cecilia's statement is still an admission of an oral lease agreement with certain terms.

¶ 63     Finally, Cecilia's argument that she was merely a guest of her father was not plausible. Her father paid only one-half of the rent due. He did not pay the full rent and allow Cecilia to live with him. The trial court's determination that Cecilia owed past due rent was not against the manifest weight of the evidence.

¶ 64                                  E. Plaintiffs: Interest

¶ 65     Plaintiffs argue in their cross-appeal that the trial court erred in denying their request for interest on the award of $60,000, which represented reimbursement for repairs performed prior to 2002 as agreed at the buyout meeting. They seek approximately $50,000 in interest, based on a rate of 5% on $60,000 over 16 years and seven months. (They do not seek interest on the award of $29,742.50 for repairs performed between 2014 and 2017.) They concede that the 2002 buyout agreement did *not* include an agreement for interest. However, they argue that they are entitled to interest under the current version of the Act, specifically sections 401(c), (d), and (e) of the Act, which provides that interest accrues from the date of the advance of funds. Again, the Act provides:

> "(c) A partnership shall reimburse a partner for payments made and indemnify a partner for liabilities incurred by the partner in the ordinary course of the business of the partnership or for the preservation of its business or property.
>
> (d) A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.
>
> (e) A payment or advance made by a partner which gives rise to a partnership obligation under subsection (c) or (d) of this Section constitutes a loan to the partnership

which accrues interest from the date of the payment or advance." 805 ILCS 206/401(c), (d), and (e) (West 2016).

¶ 66     Plaintiffs read the statute as a mandate to award interest in all cases where a partner incurred liabilities in the ordinary course of business for the preservation of the partnership property (subsection c) or where a partner advanced capital beyond his or her agreed contribution (subsection d).     However, plaintiffs admit that the Act has been amended to remove certain mandatory language.     An older version of the Act had stated: "[18(c)] A partner, who, in the aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, *shall be paid interest* from the date of the payment or advance." (Emphasis added.) *Spencer*, 240 Ill. App. 3d. at 945 (quoting Ill. Rev. Stat. 1985, ch. 106 1/2, par. 18(c)).     Now, the correlating subsection merely states: "A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute," without the ending clause stating that interest *shall* be paid.     805 ILCS 206/401(d) (West 2016).     Thus, the current version of the Act, under which plaintiffs seek interest, no longer contains the mandatory "shall."

¶ 67     Plaintiffs do not sufficiently address this change in the Act or discuss principles of statutory interpretation.     See Ill. S. Ct. Rule 341(h)(7) (eff. May 25, 2018) (appellant shall provide argument with citation to authority).     They do not cite case law concerning statutory interpretation.     Plaintiffs point to subsection (e), which states that loans accrue interest beginning on the date of the advance. However, they do not explain why this means that interest is mandatory, other than to say that the legislators could have drafted the provision to read "which *may* accrue interest."     They do not account for the equally reasonable reading that, while interest on loans are no longer mandated, should the court award interest, that interest will continue to backdate to the date of the advance. (The older version of the Act had mandated interest, but it had also provided that interest did not

- 21 -

begin to accrue until after repayment became due. See *Kennedy v. Miller*, 221 Ill. App. 3d 513, 523 (1991). Here, of course, the parties never set a repayment due date.)

¶ 68    Moreover, the cases cited by plaintiffs, *Borys v. Rudd*, 207 Ill. App. 3d 610 (1990), and *Spencer v. Riordan*, 240 Ill. App. 3d 938 (1992), do not establish that interest is mandatory. In *Borys*, the partners orally agreed to pay interest on advances at a rate of 2% above prime. *Borys*, 207 Ill. App. 3d at 619. Here, plaintiffs concede that there was no discussion of interest at the 1998 and 2002 buyout meetings when the $60,000 figure was agreed upon.

¶ 69    In *Spencer*, two partners contributed to the construction costs of a sea wall without a third partner's consent. The two partners sought to adjust the third partner's share proportionately. The court disagreed, and it kept the third partner's share the same, but it treated the other partners' advance as a loan requiring interest. *Spencer*, 240 Ill. App. 3d. at 946. However, the court relied upon the older version of Act, which contained the mandatory "shall." Here, as plaintiffs have conceded, the current version of the Act has omitted that language.

¶ 70    *Spencer* is also distinguishable because the partners in *Spencer* had a written partnership agreement. The agreement stated that partnership shares would be adjusted according to contribution of partnership capital. The court took the written partnership into consideration when deciding whether to treat the advancements to build a seawall as a contribution of partnership capital under the agreement requiring the adjustment of partnership shares (with no interest necessary), or to treat the advancements as an advancement of capital under the Act requiring interest. *Spencer*, 240 Ill. App. 3d at 945-46. The court opted for the latter, because the former required the unanimous vote of all partners, which did not occur. *Id*.

¶ 71    Here, there was no written partnership agreement by which to interpret future capital expenditures by the partners. The parties managed the partnership in a casual manner for decades,

and they cannot now complain that they have put the court in a position to render the fairest award supported by the evidence rather than the most precise award. While plaintiffs may have "lost" on some of the court's decisions, such as its refusal to award interest, it "won" on others. Indeed, while the trial court agreed with plaintiffs conceptually that the partnership was to reimburse Ralph for work performed prior to 2002, it appeared to accept the $60,000 figure without accounting for credit toward that amount that Ralph may already have received through the discounted buyout price of Raul and Vickie's shares. (Cecilia does not raise this point and it is, therefore, forfeited as a potential point of error. We raise it to highlight the trial court's difficult position in fashioning a fair award given the available evidence.) Also, plaintiffs managed the property following 2002, and it was within their power to see to the reimbursement of funds rather than let the debt grow for 15 years. The trial court may reasonably have calculated that the amount of interest sought after being ignored for over 16 years—nearly $50,000—was in conflict with a fair buyout price. Under the circumstances of this case, we uphold the trial court's refusal to award interest.

¶ 72                                    III. CONCLUSION

¶ 73     For the reasons stated, we affirm the trial court's judgment.

¶ 74     Affirmed.